236 N.J. Super. 37 (1988)
563 A.2d 1158
ANDREW G. ZWERNEMANN, PLAINTIFF,
v.
JANICE KENNY, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Bergen County.
Decided September 15, 1988.
*38 Joseph Skripek for Plaintiff (Barbaris & Skripek).
Melinda Lowell for Defendant.
KAHN, J.S.C., (temporarily assigned).
This matter involves a complaint by plaintiff ex-husband Andy Zwernemann (hereinafter referred to as Andy) against defendant ex-wife Janice Kenny (hereinafter referred to as Janice) to enjoin the removal of the infant child of the marriage, Andrew, from the State of New Jersey and for custody of said child. Janice cross-moves for permission to remove Andrew to the State of Florida. Both sides presented testimony and documentary evidence claiming that they have satisfied the standards set forth in Cooper v. Cooper, 99 N.J. 42 (1984), so as to prevail.

*39 BACKGROUND
These parties were married January 1979 and had one child, Andrew, born July 29, 1979. They separated in May 1983, and became divorced August 1984. The parties resided in Nanuet, New York at the time of the separation. Subsequently, Andy moved to Wyckoff and Janice remained with the child in Nanuet. At the time of the divorce, the parties agreed to sell the Nanuet house. Both parties, Janice using her half of the proceeds of the sale and Andy using his half of the proceeds, jointly purchased a two-family house in Northvale. I believe this unusual arrangement between ex-spouses was based upon both of the parties' desire for a suitable residence for Andrew's benefit. The divorce decree is silent as to these matters.
The parties made their own arrangement regarding equitable distribution, support, custody and visitation. No postjudgment litigation has taken place until these applications.
Andy and his present wife now reside in a one-family home of ample size and character, located in Ramsey, New Jersey, Bergen County. Janice has been remarried for approximately 18 months (Matthew Kenny) and she and her current husband continue to reside in the aforementioned Northvale home. Both parties' second marriages are presently intact and neither party has borne any children.
Andy claims a status of joint custody because Andrew lives with him 50% of the time and because Andy participated in all his activities. Andy states that in a given two-week period, Andrew resides with him one weekend (Friday, Saturday and Sunday), in addition to two nights each week, totaling 7 nights per 14 days. Andy further states that this arrangement existed since the divorce, except when he has had to leave on business trips. Herein lies one of the few conflicts in testimony. Janice contends that immediately after the divorce Andrew was on a schedule similar to that which was stated by Andy except that Andrew became confused with the varying days, not knowing where he was supposed to be. Janice said that the schedule *40 changed for a two-year period so that Andy would have the child Friday, Saturday and Sunday of every other weekend as aforesaid, but the mid-week visitation was limited to one day a week with no overnight visitation during the week. Andy disputes this.
Janice also states that only after the filing of the complaint in the fall, did Andy demand a return to more time with Andrew. Both parties acknowledge, however, that for the entire period of time subsequent to the divorce, Andy maintained a close relationship with the child through frequent personal and telephone contact. Both parties agree that Andy was involved in cub scouts, sports and other activities with Andrew. Janice, however, was the parent to contact for the school, handled Andrew's finances, and arranged for all medical and dental treatment. Overall, Andy played no part in this aspect of Andrew's life. By arrangement, Andy also paid periodic child support to Janice.
For purposes of relating undisputed facts, Andy works for BASF Corp., in a white collar capacity, earning $55,000 per year. His present wife is employed by Cignet Corp., earning $50,000 per year. Both parties acknowledge that Andy has family in the area with whom Andrew has a fine relationship. Facts relating to Janice's employment will be hereinafter detailed.

FACTS SURROUNDING REASONS FOR THE REQUESTED MOVE
Janice testified that prior to this application, in the fall of 1987, she notified Andy that she intended to move to Florida. She contends that Andy voiced no objection, although I have no testimony that such notification included removal of the child. She testified, as did Matthew, that their quarters were cramped and they were pressured by Andy to sell the house and divide the proceeds. She stated that after considering the possibility of receiving $70,000 from the sale of the house, she could not *41 purchase a suitable residence based on income earned by herself and Matthew. She testified that she and Matthew already purchased a home in Kissimmee, Florida for $80,000. They describe the new home as at least equal to, if not better, than Andy's home in Ramsey and much better than they could afford in Bergen County. She and Matthew also testified that they have job commitments wherein she will have a job from 9 a.m. to 2 p.m. in nearby Orlando. Janice testified that she will begin as a secretary and advance into purchasing, an area in which she professes experience. She states that she will earn $300 per week on a gross basis. Matthew states that he has been offered a job in the Westin Hotel chain as a bar manager for $35,000 per year plus tips and a benefit package. There is testimony, however, that the hotel is still far from completion. Matthew testified that if the job with Westin does not work out, he has a comparable job offer with another hotel. Both offers, he contends, offer major career improvement. In support of this, the parties have produced letters from these employers which generally corroborate the testimony. The Kennys plan to move to Florida on August 22, 1988, so Andrew can be timely enrolled in school.
Matthew and Janice contend that this situation in Florida will provide a significantly better life-style for them, which will have a positive effect upon Andrew's quality of life. Janice cites that the area in which they will live has newly constructed schools as well as a young community with plenty of children. She states that the cost of living is far less than that in Bergen County. Both she and her husband testified that they searched for comparable employment and housing in Bergen County and were unable to find same. Janice acknowledges that she considered that such a move would preclude the current visitation plan; but she volunteers large blocks of visitation for Andrew with his father during school vacations as well as periodic visits by Andy, if possible, during the school year. She feels that this type of plan will not be detrimental to the relationship between Andrew and his father which she acknowledges is excellent. *42 Janice also states her mother also lives in the area, which provides an advantage to Andrew. Janice and Matthew state that Janice is currently employed as a service bar waitress earning approximately $12,000 per year based primarily on a small salary and tips. Matthew is employed as a restaurant bar manager and he alleges earning $15,000 per year.
Andy feels that the relationship that he has with Andrew is so strong that the requested move would be a severe and irreparable detriment to their relationship. He argues that his present schedule is based upon quality as well as quantity of time. In seeking custody, or at the very least, in seeking to restrain the move, Andy indicates that the Ramsey school system is much better than Oceola County, Florida, and cites some literature which appears to indicate a much higher graduation rate. Neither party produced any experts as to these factors and generalized brochures may be unreliable. He offers no testimony or evidence to counter the economic reasons for the requested move but argues that in reality, the purported jobs do not demonstrate as significant an improvement as contended by Janice.
This controversy (the custodial parent's right to permanently remove an infant child from the State of New Jersey) is commonly referred to as a "Cooper Hearing" derived from the Supreme Court case of Cooper v. Cooper, 99 N.J. 42 (1984). No court order or judgment exists declaring either parent as the custodial parent of Andrew. I find that as based upon facts that have transpired since the Judgment of Divorce, both parties have actually shared joint custody. Janice, however, has been the residential custodial parent because (a) Andrew attends public school in Janice's municipality wherein she has had total contact with the school, and (b) Janice has been totally responsible for arranging all necessary medical care and paying for same. This determination is only necessary because the cases to be hereinafter discussed involve the rights of the "custodial parent." The Supreme Court in Cooper analyzed *43 previous decisional law in this State as well as in other jurisdictions and set forth standards for the purpose of determining such controversy. The Court set forth the factors to be considered:
7. The first factor to be considered is the prospective advantages of the move in terms of its likely capacity for either maintaining or improving the general quality of life of both the custodial parent and the children. The second factor is the integrity of both the custodial parent's motives in seeking to move and the noncustodial parent's motives to restrain such a move (e.g., whether the custodial parent is motivated by a desire to defeat and frustrate the noncustodial parent's visitation rights and remove himself or herself from future visitation orders or whether the noncustodial parent is contesting the move mainly to impede the custodial parent's plans or to secure a financial advantage with respect to future support payments). And the third factor is whether, under the facts of the individual case, a realistic and reasonable visitation schedule can be reached if the move is allowed.
In a given case, evidence of any of these factors may be used to militate against either the threshold showing of the custodial parent for removal, or the arguments of the noncustodial parent against removal. Id. at 56-57.
In August, subsequent to the conclusion of the subject hearing, the Supreme Court of New Jersey decided Holder v. Polanski, 111 N.J. 344 (1988). That case, again, reviewed decisional law involving a custodial parent's right to remove a child from the jurisdiction. The Supreme Court modified its prior stance by stating as follows:
As men and women approach parity, the question arises when a custodial mother wants to move from one state to another, why not? Until today, our response has included the requirement that the custodial parent establish, among other things, a real advantage to that parent from the move. Cooper v. Cooper, 99 N.J. 42, 56 (1984). We now modify that requirement and hold that a custodial parent may move with the children of the marriage to another state as long as the move does not interfere with the best interests of the children or the visitation rights of the noncustodial parent. Id. 111 N.J. at 349.
Statutory requirements are found in N.J.S.A. 9:2-2:
[when] such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction without their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parties, unless the court, upon cause shown, shall otherwise order.
Focusing on the statutory language, the Supreme Court held:
We believe, however, that the focus of the "cause" requirement should not be on the benefits that will accrue to the custodial parent but on the best interests of the children and on the preservation of their relationship with the noncustodial parent. From that perspective, the "cause" requirement of N.J.S.A. 9:2-2 *44 implicates the best interests of the child as manifested through visitation with the noncustodial parent. Cooper v. Cooper, supra, 99 N.J. at 50; D'Onofrio v. D'Onofrio, supra, 144 N.J. Super. [200] at 204-205. [(1976)] Short of an adverse effect on the noncustodial parent's visitation rights or other aspects of a child's best interests, the custodial parent should enjoy the same freedom of movement as the noncustodial parent. Id. 111 N.J. at 352.
The result of the Holder case is that three steps are required in the trial process. The first step requires a demonstration that "any sincere, good faith reason will suffice, and that a custodial parent need not establish a `real advantage' from the move." Id. 111 N.J. at 352-353. In the event a trial court finds that a good faith reason for the move exists, a court "should then consider whether the move will be inimical to the best interests of the children or adversely affect the visitation rights of the noncustodial parent." Id. 111 N.J. at 352-53.
The Court indicated with respect to a third stage that "if, however, the move will require substantial changes in the visitation schedule, proofs concerning the prospective advantages of the move, the integrity of the motives of the party, and the development of a reasonable visitation schedule remain important." Id. 111 N.J. at 353.
It is clear from Holder that the Supreme Court was concerned with first, mobility of the noncustodial parent for good faith reasons, and second, assuming good faith, a subsequently balancing of visitation (maintaining the child's relationship with the noncustodial parent) with advantages of the move. In the instant case, all three steps are necessary to be considered by this court.
During the hearing Janice attempted to demonstrate not only good faith reasons for the requested move, but also substantial advantages to her and her family if allowed to move. Although her initial burden is obviously lessened by the Holder decision, this court has sufficient information in order to determine all required issues. The first step is simple. Janice's desire to move to Florida is based generally on alleged increased economic opportunity, better climate conditions, and *45 proximity to her mother, all of which clearly fall within the concept of good faith reasons.
Andy contends, however, that such a move will not be in the best interests of Andrew because their day to day, hands-on relationship cannot continue and no adequate substitute visitation plan is feasible. There is no dispute that Andy and Andrew see each other during the week as well as on alternate weekends. Andy is involved in Andrew's extra-curricular activities such as sports and cub scouts despite the fact that they live in different communities. Janice offers blocks of time during school vacation periods such as three months in the summer as well as other week-long school vacation periods. She also suggests that any time Andy wants to travel to Florida for a weekend to see Andrew, she would permit same. She contends that if those periods were utilized, in effect, Andrew and his father would be spending a similar amount of total days with each other as they do now.
This court finds that the potential visitation plan suggested by Janice does not adequately replace the current relationship that Andrew has with both his father and his mother. Janice's plan will, in the first place, create long stretches of time wherein Andrew will not see his father. Even if his father were to visit once a month in Florida, he would not see his father three to four weeks at a time. Telephone contact is no substitute. In the second place, during those stretches of time wherein Andrew might be visiting with his father in New Jersey, Andrew will not be with his mother for long stretches, which also has never before occurred. I find that Andrew's relationship with both parents will detrimentally be affected by the move. The child cannot be shuttled on a regular basis between Florida and New Jersey. The parties do not have sufficient financial means to support such a schedule or even to travel that much themselves. While Andy does have income in the amount of $55,000 per year and possibly could obtain some *46 help from his present wife, such a plan would be financially onerous and disruptive.
In Helentjaris v. Sudano, 194 N.J. Super. 220 (App.Div. 1984) there was an initial question as to paternity at the outset. Although visitation was allowed on a weekly basis in the Helentjaris case, the noncustodial parent did not in fact visit the child every week. In that case, actually the custodial parent and the child had moved and while only two hours away by airplane, the relationship between the child and the noncustodial parent in that case had not grown significantly in comparison to the relationship in the instant case. In the Holder case, the move was from Flemington, New Jersey to New Canaan, Connecticut. The record in the Holder case also indicates that without court approval, the custodial parent could have moved to other places in New Jersey with a more severe impact on visitation than the move to New Canaan, Connecticut. The facts in D'Onofrio v. D'Onofrio, 144 N.J. Super. 200 (Ch. Div. 1976) warrant mentioning herein. The D'Onofrio case was relied upon heavily by the Supreme Court in Cooper, and certainly not repudiated by the Court in Holder. The essential consideration of the custodial parent's freedom of movement, the welfare of the child and the retention of the relationship between a child and the noncustodial parent, are still paramount. In D'Onofrio the custodial parent earned a meager living wherein the noncustodial parent, the father, was a policeman earning a fixed income. The court in that case observed that the father's monetary contributions to the mother and child were modest at best. That court also observed that the father visited the child every Friday (not overnight) as well as birthdays and holidays but often left the child with the paternal grandparents. The mother, in fact, urged the father to have the child on overnight visits, but he refused to do so. Judge Pressler stated: "The court is obliged to conclude that had the father here extended himself further on behalf of the children, both financially and otherwise, the mother would not have felt compelled to make this move." Id. at p. 211. Judge Pressler *47 further indicated that the substitute visitation wherein the wife would transport the children one week at Christmas and one week in the spring, was adequate to maintain as close as possible to the existing relationship between the child and the noncustodial parent.
The facts of the instant case are easily distinguishable. Both parties acknowledge each to be an excellent, capable and loving parent. Each feels the other is concerned for the welfare of the child. As opposed to the facts in D'Onofrio, Janice is remarried and, therefore, part of a family that earns two salaries. Janice additionally receives child support from Andy as well as help with the day to day activities of the child. Additionally, Andrew resides with his father from three nights at a minimum to seven nights at a maximum every two weeks, which, of course, helps to ease both the financial and physical pressure of child-raising from her shoulders.
Accepting Janice's best case that in addition to a lower cost of living, Florida offers increased salaries, these advantages do not outweigh the severe detriment to be caused by breaking up a nine year old child's security of having both parents close by and intimately involved in his life. Blocks of visitation wherein the child will be always near one parent and totally away from the other, is a major deviation from what has transpired during the last five years of his life. The courts recognize the obvious  that once there is a divorce and parents reside in separate habitations, the relationships between the children and the parents can never be the same. In the instant case, during the last five years, this child has had the best of the possibilities  two parents that spend a great deal of time with him without the animosity that frequently accompanies close contact between all parties. In this situation, the powerful relationship between Andrew and his father, which I find to be a positive influence on Andrew's life, is not outweighed by whatever economic advantage Janice claims would exist in Florida.
*48 In finding that the purported advantages of the move to Janice do not outweigh other factors, I must also make some observations as to Janice and Matthew's testimony. As aforesaid, they testified earning approximately $27,000 between them, wherein living in Florida would produce in excess of $35,000 to Matthew and $15,000 of annual income to Janice. They contend that this, coupled with the purchase of a home for less than $100,000, will provide a significant life-style change.
I accept the evidence as fairly reliable that the job offers in Florida are legitimate. It is the testimony involving their current earnings that I find unreliable. Each testified that their respective income is based mostly on tips. Each submitted tax returns. The fact that Matthew has been employed as a bar manager or bartender for at least ten years renders it difficult for me to believe that he only earns $15,000 a year, especially having worked for hotel chains as well as restaurants I believe that he earns considerably more. Even, however, if his claim were borne out, there is little testimony to indicate any significant attempt by either to find better employment or housing so as to preserve Andrew's relationship with his father.
No significance is placed upon the fact that Janice and Matthew already purchased a home in Florida. This was a calculated risk on Janice's part since it was prior to or concurred with the applications herein and she did not have Andy's agreement to allow the move with Andrew.
For the foregoing reasons, I order as follows:
A. Janice is restrained from removing Andrew to Florida; and consequently, Andy's application for such restraint is granted; and
B. Andy's application for sole custody is denied because he admitted that Janice was a good parent and he failed to demonstrate any facts that would warrant a change in the existing relationship; and
C. The parties shall have joint custody of Andrew, with Janice the residential custodial parent.
*49 D. No order for visitation shall be entered at this time without prejudice to either party's right to seek a formal visitation order or a modification of the existing visitation plan.