721 A.2d 317 (1998)
317 N.J. Super. 103
Gregory VOIT, Plaintiff,
v.
Lisa VOIT, Defendant.
Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County.
Decided June 10, 1998.
*319 Michele Siekerka, Trenton, for plaintiff (Needell, Siekerka & Castellani, attorneys).
Darrlyn Mann, Vineland, for defendant (Mann & Moore, attorneys).
*318 MICHAEL BROOKE FISHER, J.S.C.
This case concerns the always troublesome issue of whether a parent may permanently remove a child from New Jersey against the objection of the other parent. Such cases are generally analyzed under the rules and reasoning set forth in two New Jersey Supreme Court cases, Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (1984), and Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988). However, under the unique facts of the instant case, where both legal and physical custody is truly shared, the Cooper/Holder analysis, with its concomitant burden on the parent resisting the move out of state to come forward with evidence that a proposed alternative visitation schedule would be impossible or unreasonably burdensome, is inappropriate. While much of the reasoning of those cases applies, the placing of such a burden of proof on the parent resisting the move would be unfair given the totally shared-parenting arrangement that has to date been engaged successfully by the parties herein. However, before analyzing the law of removal articulated in Cooper and Holder, the facts of this case must first be set forth.
In this matter, Dr. Gregory Voit, an orthopedic surgeon in Vineland, New Jersey, seeks permission of the court to relocate with his son, Garet, from New Jersey to Arizona. His former wife, Mrs. Lisa Voit, who also resides in the Vineland area, objects to the move. The Voits have resided in New Jersey since September 1996.
Dr. Voit met Mrs. Voit in the mid-1980's, while both were undergraduates at the University of Rochester, in Rochester, New York. Mrs. Voit was a native of the Rochester area while Dr. Voit had grown up in New Jersey. They began dating during their undergraduate years. After Dr. Voit attained his undergraduate degree, he stayed at the University of Rochester to attend medical school. The parties dated throughout Dr. Voit's medical school training and were married on June 5, 1987. They remained in Rochester throughout Dr. Voit's internship, which he also completed at the University of Rochester. During Dr. Voit's medical training, Mrs. Voit worked as a soccer coach, and as a paralegal at a law firm in the Rochester area.
In June 1991, the parties moved to Portland, Oregon, where the doctor had secured a surgical residency in general orthopedics. He obtained the residency through a competitive matching process used to place applicants with residency programs. Despite the cross-country move required by the placement, both parties agreed that moving was appropriate, given the scarcity of available residency placements. Both agreed, however, that they would return to the East Coast upon Dr. Voit's completion of the residency. The Voits' only child, Garet, was born in Oregon on February 25, 1993.
During the time the parties lived in Oregon, Mrs. Voit obtained a job with Nike at its corporate headquarters. She particularly enjoyed her job with Nike because it allowed her to pursue her keen interest in sports. While at the University of Rochester, in addition to obtaining her bachelor's degree in political science, Mrs. Voit was also an All-American in women's soccer. After her graduation, she remained with the team as an assistant coach. Her interest in soccer, and sports generally, remained strong thereafter. Thus, Nike, with its obvious connection to sports, was a very desirous employer for her. Mrs. Voit received promotions and salary increases during her tenure at the company. She worked there from September *320 1991 until the time that the parties left Oregon.
In June 1995 the Voits left Oregon for Albuquerque, New Mexico so that Dr. Voit could pursue a one-year fellowship in hand and micro-vascular surgery. He obtained the fellowship through a matching process similar to the one he participated in to secure his residency. Despite Mrs. Voit's career at Nike, she willingly left her job and accompanied Dr. Voit to New Mexico. Both parties continued to assume, however, that they would move back to the East Coast. Their return to the East was in effect postponed an additional year in order to accommodate Dr. Voit's desire to pursue the hand surgery fellowship.
Unfortunately, by the time the parties moved to New Mexico, their marriage was unraveling. According to Dr. Voit, the marriage was troubled for a long time. He testified that, even before they left Rochester for Oregon, he had told his wife he was unhappy in the marriage. Mrs. Voit denied that she was aware of any problems in the marriage at the time they moved from Rochester to Oregon. On the contrary, she testified that she believed they were happily married when they left Rochester. She also testified that, given the distance from her family and home, she would not have left for Oregon had she known that Dr. Voit had misgivings about the relationship.
Mrs. Voit acknowledged, however, that the marriage was troubled by the time they left Oregon for New Mexico. The testimony established that Dr. Voit had been engaged in a longstanding extra-marital relationship while in Oregon that began prior to the birth of the parties' son in 1993. Mrs. Voit denied that she knew, before moving to New Mexico, that the doctor had been engaged in such an affair. Instead, she attributed the problems in the marriage to his "awful hours" and the "slave labor" of the residency program. She hoped that the parties could work out their differences under the less stressful conditions of New Mexico. Once in New Mexico, however, Mrs. Voit soon became aware of the affair. She then obtained a separate apartment near the home that Dr. Voit continued to share with their son, Garet.
Since the separation, Garet has spent considerable and regular time with both parties. During testimony, both parties stressed how, from the beginning of their separation, they have attempted to "maximize" the time the child spent with the parties as opposed to third-party caretakers. For example, while in New Mexico, instead of arranging for a third party to be with the child while the doctor worked, Mrs. Voit would care for Garet at Dr. Voit's residence.
Despite their ability to parent cooperatively, the parties did not resolve their marital differences. Mrs. Voit testified that between April and August of 1996, the parties worked out the terms of a divorce agreement with the assistance of a mediator. Care and custody of Garet was the primary issue during the negotiations. The mediation agreement was incorporated into a stipulated final decree of dissolution of marriage. The parties filed this final decree in New Mexico on October 15, 1996, by which time the parties had already relocated together to New Jersey. In part that agreement provided for "joint legal and physical custody" of Garet and said as to future issues that "the parties will mutually consult and agree on major matters including living arrangements."
More specifically, the agreement provided that Dr. Voit would have Garet in his care each week from Thursday evening at 6:00 p.m. through Monday morning at 9:00 a.m., with Mrs. Voit having care of Garet for the rest of the week. Mrs. Voit testified that from the beginning of their separation until December 1997 or January 1998, the parties consistently deviated from any set schedule so as to maximize Garet's time with each party. She referred to the mediator's breakdown of time as "boilerplate language," intended to provide a fall-back schedule in case the parties could not agree on a more flexible arrangement. Dr. Voit also indicated in his testimony that the letter of the mediated schedule was not always adhered to. Mrs. Voit maintained that, particularly after the parties relocated to New Jersey, she had Garet even more than the formal schedule indicated. Nevertheless, she conceded that the parties have always maintained a close *321 parity in the time that they spend with Garet.
Both parties concurred that at some point in late 1997, after the parties came to New Jersey, Dr. Voit finally requested that they adhere to the specific times in the agreement. He said that request was made in November 1997. She indicated that the request occurred in December 1997 or January 1998, when the doctor retained an attorney to help him with his removal application. Mrs. Voit asked the court to infer that the motivation for the doctor's insistence on strict compliance with the agreement was his concern that she might be viewed by the court as the de facto residential parent in a removal proceeding.
As has been noted, the parties have resided in New Jersey since September 1996. By the conclusion of his fellowship in New Mexico the doctor had narrowed his job search to three positionsone in Texas, one in Maryland, and the one that he ultimately chose in Vineland. Even though the parties were finalizing their divorce, they cooperated with each other and, consistent with their long avowed plans, selected a site on the East Coast. Mrs. Voit visited New Jersey before the move and helped to select the parties' respective residences. The parties even followed each other in vehicles to New Jersey so as to share in moving expenses and child care.
On September 24, 1996 the doctor commenced employment with a private orthopedic practice in Vineland. From the inception of his employment he was unhappy, although not with his salary. The salary called for by his contract is $135,000 a year, plus an incentive bonus, which in 1997 was an additional $17,000. Were he to stay in Vineland, Dr. Voit would stand to become a shareholder in the practice at the beginning of 1999, and thus potentially to earn more money than he does currently. Despite his good salary, Dr. Voit said that he did not like "the terms and control and complete legal superiority" that he felt the contract gave to his employer. He testified that the contract he signed was unduly harsh because, were he to breach the contract, the employer could obtain injunctive relief against him without benefit of a court proceeding. (It should be noted, however, that, in fact, the contract only provided that the employer could apply to the court for such relief.) In addition to his concerns about the contract, the doctor made it clear that he did not like the nature of the practice of his employer. As to them he testified, "Their goal is to make money."
His unhappiness with the contract's language and distaste for a money-oriented practice caused him to begin a search for other employment before he even began his job in Vineland. He primarily wanted to return to academics and sought employment with a teaching hospital. He ultimately located such an opportunity with the University of Arizona. There he would be an assistant professor of clinical surgery in the orthopedic section of the University Hospital's department of surgery. He would teach, conduct research, and perform surgeries. His salary would be $130,000 per year, plus a $6,000 education component and a pension plan.
In April 1997 he was offered the position, which has been kept open for him specifically until July 1, 1998. He had discussions with Mrs. Voit where he asked her to relocate again. Ultimately, discussions ceased and through his lawyer he sought approval to move with Garet. Regarding visitation, Dr. Voit proposes first that Mrs. Voit relocate with him and Garet to Arizona so that the parties might continue their coparenting arrangement. In the alternative, should Mrs. Voit not wish to relocate, Dr. Voit would pay for a visitation arrangement in which the child would spend complete summers and all extended school vacations with Mrs. Voit.
Mrs. Voit said she was aware that Dr. Voit was looking elsewhere for employment since August 1996. In May 1997 he told her of the opportunity in Arizona. She responded that she did not feel she could move there, and that Garet and she would lose contact with her family again, all of whom remained in the Rochester, New York area. She stressed that the ability, at anytime, to spontaneously visit her family by simply getting in her car and driving for a visit, as opposed to the rigors of cross-country flying, was important to her.
*322 Mrs. Voit also testified that she has established meaningful connections to New Jersey and desires to remain here. She has played and coached soccer in the area for two years. She currently coaches a soccer team at Cumberland County College. She is also involved in a dating relationship that began in September 1996. The relationship is exclusive in nature and she says it has real potential. She does not have a full-time job in New Jersey but the mediated agreement provides, in addition to child support, that she receive $2,666 a month in alimony until September 1, 1999. Indeed, the parties contemplated that she would not enter the work force again on a full-time basis until Garet was of school age.
In April 1997, Mrs. Voit was herself offered an attractive opportunity for out-of-state employment when Nike contacted her and offered her a position back in Oregon. The job description related to soccer. She did not accept the position, telling the court that it was "the best job for me, but not the right thing to move and take Garet away from his dad and family." She also testified: "It is not in my best interest to relocate. It's not in Garet's best interest to relocate. I believe it would be difficult for Garet to move from either parent. I can drive to my family. I would have to leave a personal relationship, and professionally I am starting to get recognition as a coach. If I based decisions strictly on career, the Nike job would be the best for me. That type of job won't be offered to me again."
When Dr. Voit was cross-examined as to his reason for accepting a job in Arizona he said, "Because it is the single best job for me." Mrs. Voit's lawyer also inquired as to why he did not seek an academic position in the Philadelphia area. He indicated that when he initiated his search in August 1996 the job market in Philadelphia was "in flux" due to the merger of several hospitals. He admitted, though, that he had not continued searching in this area. He also admitted that he has continued his relationship with the woman with whom he had an affair during his marriage. He expects she might move from Oregon to Arizona.
When asked by Mrs. Voit's attorney what he would do if the court did not let him move with the child, Dr. Voit indicated he did not know what he would do. He implied that he might well move, however, when he testified, "This is an ideal job. It is not just anything." He also testified that, "Either way Garet loses if we don't reside near each other. Garet is currently thriving, well-adjusted and happy." On the other hand, when asked by his own attorney about what would happen should his request be denied, he discussed the possibility of not taking the job and thus "forgoing everything that I think is best for him and for me."
Based on the testimony and motion papers, the court believes that the "everything" referred to by Dr. Voit was comprised of three components: 1) the superior job offered to the doctor; 2) the better educational opportunity available for Garet in Arizona; and 3) the health benefits to Garet in moving to Arizona.
As to the second component, Garet's education in Arizona versus New Jersey, in motion papers filed prior to the hearing, Dr. Voit attempted to submit information as to the superiority of the education available in Arizona. This argument was entirely abandoned by the doctor at trial. Indeed, when asked if New Jersey could educate Garet well, he responded, "Surely."
To prove the third component, Dr. Voit presented the child's pediatrician, Dr. Henderson. Dr. Henderson saw Garet a total of six times from March 1997 to the present. He deemed four of those visits allergy-related. Garet's visits to the doctor were during the spring and fall seasons. Dr. Henderson noted that "our area" has molds and pollens that exacerbate allergies. He opined that the drier climate of Arizona would be beneficial to Garet. On cross-examination he admitted that he did not refer Garet to an allergist, but simply treated him symptomatically.
The court finds that the testimony of the pediatrician did not indicate to a reasonable degree of medical certainty or probability that Garet even suffered from allergies. Moreover, even if he suffered from allergies, there was no indication that Garet suffered *323 any serious medical problem that was not capable of being treated. Such limited medical treatment in no way justifies the removal of Garet from New Jersey to Arizona.
Thus, since Dr. Voit abandoned the educational issue and the court rejects the notion of the necessity of moving to Arizona for Garet's health, this case is reduced to a decision as to whether allowing the removal of Garet so that the doctor may accept a job offer in Arizona is in the best interests of the child.
In making its determination, the court accepts that, if Dr. Voit were allowed to move with Garet and Mrs. Voit chooses not to relocate to Arizona, an optimum visitation plan could be achieved. Dr. Voit would be earning a substantial income and has demonstrated his good-faith desire that Mrs. Voit remain an important part of Garet's life. Dr. Voit's proposal that Garet visit his mother during summers and holidays at the doctor's expense is feasible, despite the cost and distance.
The court also notes that the parties specifically stipulated to the court that they have equal parenting skills and that the child is bonded equally well to both. Apart from this stipulation, the court was impressed with the ability of the parties in the past to cooperate to a remarkable degree in order to achieve the best for their child. As a result of that cooperation, each is intimately and equally involved with their child on virtually a daily basis and the child is, in the words of Dr. Voit, "thriving, well-adjusted and happy." Clearly now, however, the parties can no longer continue to agree on how to achieve the ultimate goal of both, the best interest of their child, and must now turn to the court for such a determination. This court finds Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (1984), and Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988), helpful in deciding that issue, but concludes that those opinions are not entirely on point.
An analysis of New Jersey's law of removal must begin with N.J.S.A. 9:2-2, which provides in relevant part:
[When] children are natives of this State or have resided five (5) years within its limits, they shall not be removed out of its jurisdiction ... without the consent of both parties, unless the court, upon cause shown, shall otherwise order.
Technically, N.J.S.A. 9:2-2 does not apply since Garet is neither a native of New Jersey nor has resided here for five years. However, both parties have consented to the issue being decided under the statute, and this court accepts jurisdiction.
Since the 1980's, our courts have been guided in applying N.J.S .A. 9:2-2 by the analysis and interpretation of that statute contained in the New Jersey Supreme Court cases of Cooper v. Cooper, supra, 99 N.J. 42, 491 A.2d 606, and Holder v. Polanski, supra, 111 N.J. 344, 544 A.2d 852. The facts of both cases involve a custodial mother who wished to remove her child from the state over the objections of the noncustodial father. Thus in both Cooper and Holder, the Court addressed the traditional case where the custodial parent desires to move and the noncustodial parent opposes that move. Indeed, in applying N.J.S.A. 9:2-2 to those facts, the Court in Cooper held that the statute "provides that children of divorced parents should not be removed from this jurisdiction without the consent of the noncustodial parent `unless the court, upon cause shown, shall otherwise order'." 99 N.J. at 49, 491 A.2d 606 (emphasis added).
Cooper establishes the relevant interests that a court must weigh in any removal case: the moving parent's freedom of mobility, the competing interests of the objecting parent, and the best interests of the child. Id. at 55-56, 491 A.2d 606. The "cause" requirement of N.J.S.A. 9:2-2 attempts to regulate those interests. The purpose of the statute is "to preserve the rights of the noncustodial parent and the child to maintain and develop their relationship." Id. at 55, 491 A.2d 606. The task of a court in achieving that purpose is "to balance those rights with the right of the custodial parent to seek a better life." Holder, supra, 111 N.J. at 350, 544 A.2d 852. In striking that balance between the parties, however, the court must be guided by what is best for the child. Indeed, "the beacon remains the best *324 interests of the child[]." Id. at 353-54, 544 A.2d 852.
Cooper held that, in the custodial/noncustodial case, the best interests of the child are interwoven with the well-being of the custodial parent. According to the Court:
The realities of the situation after divorce compel the realization that the child's quality of life and style of life are provided by the custodial parent. That the interests of the child are closely interwoven with those of the custodial parent is consistent with psychological studies of children of divorced or separated parents....
Because the best interests of the child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account.
[Cooper, supra, 99 N.J. at 53-54, 491 A.2d 606.]
Thus, the Court in Cooper incorporated a consideration of the well-being of the custodial parent into its consideration of the best interests of the child.
The Court also showed great concern for the liberty interests of the parents. In Cooper, it noted that the noncustodial parent, who did not share equally in the burden of child rearing, generally enjoyed greater autonomy than the custodial parent. Id. at 55, 491 A.2d 606. In Holder, supra, 111 N.J. at 349, 544 A.2d 852, the Court forthrightly identified the potential gender inequity implicit in this situation. See Murnane v. Murnane, 229 N.J.Super. 520, 529, 552 A.2d 194 (App.Div.1989) (observing that "Holder proceeds from the premise of the legal equality of men and women"). The Court noted the societal reality that, although with "increasing frequency" parents of both sexes were beginning to share the responsibility of child rearing, "in many instances the mother still receives custody of the child." Holder, supra, 111 N.J. at 349, 544 A.2d 852. To remedy any unfair encumbrance on the often female custodial parent that might arise from such a societal reality, the Court established a principle of equality to guide its administration of the removal statute, ruling that "the custodial parent who bears the burden and responsibility for the child is entitled, to the greatest possible extent, to the same freedom to seek a better life for herself or himself and the children as enjoyed by the noncustodial parent." Cooper, supra, 99 N.J. at 55, 491 A.2d 606; see also Holder, supra, 111 N.J. at 352, 544 A.2d 852 (ruling that, subject to certain limitations, "the custodial parent should enjoy the same freedom of movement as the noncustodial parent").
This balancing of the parents' liberty interests, when taken together with the finding that a child's best interest is more a function of the relationship with the custodial parent, established a framework for achieving the best interests of the child while at the same time recognizing the legal equality of women. Consistent with that framework, a priority was placed on the liberty interest of the custodial parent over the visitation rights of the noncustodial parent. Thus, the Holder Court observed:
Maintenance of a reasonable visitation schedule by the noncustodial parent remains a critical concern, but in our mobile society, it may be possible to honor that schedule and still recognize the right of a custodial parent to move.

[111 N.J. at 353, 544 A.2d 852.]
The parceling of burdens in a custodial removal case reflects this prioritization of rights. Cooper placed the initial burden on the custodial parent. Under Cooper, the custodial parent must have shown "a real advantage" to the proposed move. 99 N.J. at 56, 491 A.2d 606. That burden was not a heavy one, however, for the advantage "need not be a substantial advantage but one based on a sincere and genuine desire of the custodial parent to move and a sensible good faith reason for the move." Ibid. Once the custodial parent made that threshold showing, a trial court was to consider three factors. The first factor was the prospective advantages of the move. The second was the integrity of the motives of the parents. And the third was whether, under the facts of the individual case, a realistic and reasonable visitation schedule could be reached if the move was allowed. Id. at 56-57, 491 A.2d 606.
*325 In assessing whether a visitation schedule was reasonable, the Court placed the burden on the noncustodial parent:
Since the noncustodial parent has the necessary information to demonstrate that an alternative visitation schedule is not feasible because of distance, time, or financial restraints, we place the burden on that parent to come forward with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child.

[Id. at 57-58, 491 A.2d 606.]
Where the noncustodial parent succeeded in showing that visitation would be adversely affected, a court was then to balance the competing interests of the parties. Id. at 58, 491 A.2d 606.
Holder modified the Cooper standard to make it easier on the custodial parent to prevail in an application for removal. Holder followed the custodial versus noncustodial distinction of Cooper. However, Holder modified the burden on the moving parent. Holder eliminated the "real advantage" requirement for removal and replaced it with the less burdensome "good faith reason" standard. 111 N.J. at 352-53, 544 A.2d 852. At the same time, Holder left the burden on the noncustodial parent to show that no alternative visitation plan could be established that would adequately protect the relationship between the child and the noncustodial parent. Id. at 353, 544 A.2d 852. Moreover, Holder clarified that the change in visitation must do more than merely modify the existing visitation rights, but must "substantially change" those rights. Ibid.; see also Winer v. Winer, 241 N.J.Super. 510, 521, 575 A.2d 518 (App.Div.1990) ("Under Holder some level of reduction in the amount of visitation must be deemed acceptable."). Thus under Holder, the burden on the custodial parent to justify removal was lessened, but the burden on the noncustodial parent was retained and intensified.
In sum, the whole thrust of Cooper and Holder is, where a request for removal is made by a custodial parent, to prioritize the rights of the custodial parent and then to accommodate, as much as possible, the lesser rights of the noncustodial parent. The best interest of the child is achieved, according to this standard, because the custodial parent is given freedom of mobility to seek out better life opportunities equal to that of the noncustodial parent. This in turn serves the child, whose well-being is more closely interwoven with the relationship to the custodial parent than it is with the relationship to the noncustodial parent. As a result of the Cooper/Holder standard, the overarching trend has been, appropriately, to allow removal when requested by the custodial parent.
Nevertheless, the Cooper/Holder calculus is simply inapposite to a true shared-parenting case. In a successful shared-parenting case like the one at hand, there is no inequality between the parents' contributions to the child's best interest. To apply a Cooper/Holder analysis to the facts of this case then would be both artificial and inappropriate. There is no noncustodial parent here. Dr. and Mrs. Voit exercise joint custody in every sense of the expression. Neither simply "visits" with Garet. Instead, as the parties agree, both have shared equally in the rights and responsibilities of parenting. Thus, using the best interests of the child as a beacon, neither parent's current rights to the child should take priority over the other's.
To understand the artificiality of placing the heavier burden on the party resisting the move in a shared-parenting case, the court need look no further than the facts of this case. Here, both parents have had opportunities to relocate. Mrs. Voit's opportunity came first when Nike offered her the job in Oregon. If she had decided to accept it, then she could have been the parent requesting removal, and thus would have been the one required to show only a "good faith reason" for the move. In that scenario, Dr. Voit would have been the objecting parent with the burden to come forward with reasons resisting her request. Such an important burden should not be determined by such happenstance. Such a burden only makes sense in the custodial and noncustodial parent context, where, in order to achieve the best interests of the child, the rights of the *326 custodial parent take priority over that of the noncustodial parent.
Thus, this court feels compelled to apply another standard to resolve the removal issue in this joint-parenting case. In doing so it attempts to remain consistent with the spirit of Cooper and Holder. In those cases, the Court was attentive to the societal reality that women, who are often already burdened with raising the child, would be further disadvantagedliterally kept in their placeif they also had to shoulder a heavy burden in establishing grounds for removal. The Court thus fashioned an interpretation of the statute that recognized this need for equality and used it as a means to achieve the best interest of the child.
That analysis is still appropriate in traditional removal cases involving custodial and noncustodial parents. However, this court notes the reality that shared-parenting arrangements continue, to borrow the language of Holder, in their "increasing frequency." Supra, 111 N.J. at 349, 544 A.2d 852. It is thus appropriate to establish a standard that reflects this burgeoning equality in parenting. In fashioning this standard, maintenance of the parent's right to move remains a critical concern, but in our society, where parents increasingly agree to share the rearing of their children, it may be possible to honor the right to move and still recognize the right of a parent and child to maintain their established relationship. Moreover, this court notes that in a true shared-parenting case, there is no noncustodial parent with superior rights of mobility. Thus, in the shared-parenting situation, the Cooper/Holder policy that the parents be of equal mobility is satisfied. However, the standard of mobility is no longer the mobility enjoyed by an unaccountable noncustodial parent, but rather that of a custodial parent fully cognizant of the sacrifices required to raise a child.
When Dr. Voit filed his original notice of motion he requested two things. First, he requested the right to remove his son to Arizona. Second, he requested a change in the custody agreement so that he would have physical custody of Garet during the school year. In this particular case, the requests have been made in reverse order. This case is first and foremost a request for modification of a joint legal and physical custody agreement. See McMahon v. McMahon, 256 N.J.Super. 524, 536, 607 A.2d 696 (Ch.Div. 1991) (finding that allowing removal in shared-parenting case would "in fact change [defendant's] relationship with the children from a custodial to a noncustodial one"). The true issue presented, therefore, is whether there should be a change in custody. Accordingly, the two questions presented to the court by Dr. Voit regarding removal and change of custody are not analytically distinct: to determine whether good cause exists for removal in this true joint-parenting case, this court must apply the standard appropriate to applications for a change in custody.
The standard in custody modification cases is the best interests of the child standard. Mastropole v. Mastropole, 181 N.J.Super. 130, 136, 436 A.2d 955 (App.Div. 1981); Todd v. Sheridan, 268 N.J.Super. 387, 398, 633 A.2d 1009 (App.Div.1993). In such a case the burden is on the party seeking the modification. Beck v. Beck, 86 N.J. 480, 496 n. 8, 432 A.2d 63 (1981). To meet that burden, the party seeking the change in custody must show that, due to a substantial change in circumstances from the time that the current custody arrangement was established, the best interests of the child would be better served by a transfer in custody. Mastropole, supra, 181 N.J.Super. at 136, 436 A.2d 955; Todd, supra, 268 N.J.Super. at 398, 633 A.2d 1009. Thus, in this case, Dr. Voit must show a substantial change in circumstances that would merit his having residential custody of Garet. The primary consideration of the court in assessing whether Dr. Voit has met his burden is the best interests of the child. Under such an analysis it is Dr. Voit that is saddled with a burden, not Mrs. Voit.
This burden is not an insurmountable one. This court finds that the doctor's reason for his move meets the minimal "good-faith reason" standard of Holder. Dr. Voit truly desires to work in academia and is not requesting to move in order to interfere with Mrs. Voit's parental rights.
*327 Furthermore, for purposes of these proceedings, the court assumes that Dr. Voit will move. See Murnane, supra, 229 N.J.Super. at 528, 552 A.2d 194 ("If the two parties claiming custody each proposes to live in a different jurisdiction, the court is bound to take that fact into consideration."). In assessing the best interests of the child the court does not compare the status quo shared-parenting arrangement, which both parents have indicated works best for Garet, with relocation. Such a comparison would truly make the burden impossible to meet. Instead, after assuming that the doctor will move, this court has simply considered whether going with his father or remaining with his mother is in Garet's best interests. Consistent with the burdens placed on the parties in the context of a change of custody application, this court places no burden on Mrs. Voit to come forward to show the infeasibility of an alternative visitation arrangement.
Applying the traditional modification analysis to the facts set forth above, the court concludes that the doctor has not met his burden. Both parents are bonded with Garet. Both parents have exemplary parenting skills. Indeed, "[b]oth parties acknowledge each to be an excellent, capable and loving parent," and "feels the other is concerned for the welfare of the child." Zwernemann v. Kenny, 236 N.J.Super. 37, 47, 563 A.2d 1158 (Ch.Div.1988). However, while the doctor has shown a good-faith reason for his moving, he has utterly failed to show it is in Garet's best interest to be in Arizona with him as opposed to in New Jersey with Mrs. Voit. Instead, based on the stipulations and testimony of the parties, the court finds that the parties, if they were to separate, would be equally well suited to care for Garet.
It should be noted, however, that although both are equal in their ability to care for Garet, the court finds that equitably, they are not in such equipoise. The doctor's personal ambition, although a good-faith reason in the Holder sense, is, equitably speaking, an insufficient reason to modify an agreement that these parties have agreed upon and lived with since 1996. The court notes that the doctor currently makes a substantial income, with a potential for more in the near future. His unilateral decision to criss-cross the continent again for the "ideal job," while a benefit to him personally, is not enough, taken alone, to merit a change in custody and removal of Garet from the jurisdiction. Nor is it fair to Mrs. Voit, who has relied on Dr. Voit's representations regarding both the return to the East Coast and his desire to jointly parent the child. At some point Mrs. Voit should be able to move on with her life and not remain a perpetual hostage to Dr. Voit's career. Thus, given the current circumstances of this case, wherein both parties acting alone could care equally well for Garet, Dr. Voit will not be rewarded for his decision to end the status quo.
The determination of this court is, as it must be, a fact-sensitive one. Because the court must make its decision based on the facts as presented, it limits its ruling to those facts. Moreover, this court has made its ruling in the full knowledge that "after a divorce a child's subsequent relationship with both parents can never be the same as before the divorce." Cooper, supra, 99 N.J. at 53, 491 A.2d 606. Thus the court does not insist that the Voits "maintain a wholly unrealistic simulation of unity" by requiring them to maintain their current relationship indefinitely. Ibid. Rather, the court is cognizant that this unusual relationship may someday change. For example, one of the parties may remarry, or a distant family member become ill and need assistance, the shared-parenting style of child rearing may change to a more traditional custodial arrangement, or the doctor may find work in a nearby state. Whatever the future, the practicalities of the then-existing situation may dictate a change. Thus the court does not preclude either party from applying for removal in the event of such changed circumstances.
Both attorneys cited two cases to the court, Zwernemann v. Kenny, 236 N.J.Super. 37, 563 A.2d 1158 (Ch.Div.1988), and Rampolla v. Rampolla, 269 N.J.Super. 300, 635 A.2d 539 (App.Div.1993). This court finds support for its decision in Zwernemann, wherein the court, in a joint-parenting situation, enjoined a wife's move with a child to Florida. Supra, 236 N.J.Super. at 48, 563 A.2d 1158. Like in the present case, the *328 child spent an even amount of time with each parent. Id. at 39, 563 A.2d 1158. Moreover, this court finds support in Zwernemann for its identification of the need for a new standard to apply to shared-parenting removal cases. There, despite the equal-time arrangement presented in the facts of the case, the court named the mother the residential custodian and applied the Cooper/Holder analysis. Id. at 42, 563 A.2d 1158. However, it noted that it did so only "because the cases to be hereinafter discussed [Cooper and Holder ] involve the rights of the `custodial parent'." Ibid. Thus, the court in Zwernemann admitted that it felt constrained to interpret its facts to fit the case law rather than allow the facts to determine the appropriate standard for the case's proper resolution. This court no longer feels so constrained and thus does not stretch its interpretation of the facts of this shared-parenting case only to apply an inappropriate standard.
In some regards, Rampolla, supra, 269 N.J.Super. 300, 635 A.2d 539, is also similar to the present case. The parties there had an agreement that provided for joint legal custody and shared residential custody of their two children. Id. at 301-02, 635 A.2d 539. Their agreement in fact required them to "maximize" contact and to reach a mutual agreement as to any intended relocation. Id. at 302, 635 A.2d 539. In the spirit of the agreement the parties lived in close proximity to each other. Id. at 303, 635 A.2d 539. And there, as in this case, the trial judge noted their successful coparenting. Ibid. After divorcing, the parties continued to live in New Jersey. Ibid. Mr. Rampolla commuted to work almost four hours round trip to lower Manhattan. Ibid. When Mrs. Rampolla remarried she wanted to remove the children to Staten Island, her native residence and the residence of her new husband. Id. at 303-04, 635 A.2d 539.
The lower court in Rampolla applied the Cooper/Holder analysis and denied the removal. The Appellate Division reversed and remanded, concluding that the trial court "failed to address an issue which is crucial to the disposition of this case: whether defendant could relocate as a method of ensuring the vitality of the shared-custody arrangement." Id. at 307, 635 A.2d 539. The court commented:
Realistically in most case, both parties will not have equal opportunity to relocate. However, there will be cases in which the party resisting the move has the flexibility to live elsewhere.... What is important is that this inquiry [whether the objecting party should relocate] should be made in every Holder case.

[Id. at 308, 635 A.2d 539.]
In the instant case, Dr. Voit stressed Mrs. Voit's ability to relocateher "flexibility," in the parlance of Rampolla. But there are vast factual distinctions between this case and Rampolla. Dr. Voit is not requesting to remove Garet because he is remarrying someone located elsewhere. Nor is he requesting to move to a neighboring state. On the other hand, Mrs. Rampolla married a New Yorker, and even more importantly, Mr. Rampolla drove two hours to New York every workday morning. Common sense dictates that the issue of Mr. Rampolla's relocating had to at least be explored. It seems that Mr. Rampolla in the facts of that case was truly being inflexible.
The same cannot be said here of Mrs. Voit. In the past she has been flexible, moving several times in order to accommodate Dr. Voit's career. Asking Mrs. Voit now to move to Arizona is asking more than the "flexibility" that the Appellate Division asked the trial court in Rampolla to explore. Moreover, as the facts of this case indicate, flexibility does not necessarily equate with fairness. Even assuming the flexibility attributed to Mrs. Voit by her former husband, after years of planning on a return East, it would be unfair to hold her admittedly shallow roots in New Jersey against her before she has a chance to reestablish herself. This is especially so given the terms of the alimony agreement, wherein the parties agreed that Mrs. Voit could focus on raising Garet instead of immediately embarking on a full-time career.
This court had the opportunity to hear the testimony, observe the parties, consider their motivations, and consider the effect of removal on the parties and their son. As the *329 trial evolved, then concluded, the court formed an opinion as to the proper ruling. The court notes that under either its analysis of the law or the more traditional, and on these facts less correct, Cooper/Holder analysis, the court's ultimate decision would be the same. The Cooper/Holder analysis, like all judicially crafted standards, requires qualitative, as well as quantitative, consideration. A decision is not to be rendered by a judge hearing testimony with a pencil in one hand and a check list in the other. A judge must do equity, not simply tally up a list of factors. Indeed, the real value of requiring a detailed analysis of factors, such as those outlined in Cooper and Holder, is to test a judge's innate sense of what is equitable and just. Such testing may well require a judge to modify his or her initial inclination. That did not happen in this case. Although the doctor had a good faith reason for his move, even the generous visitation arrangement proposed by Dr. Voit could not replace the intimacy of the relationship between Garet and Mrs. Voit without an adverse effect on Garet's best interests. See Zwernemann, supra, 236 N.J.Super. at 45, 563 A.2d 1158.
To reiterate, this court declines to decide this case based on a Cooper/Holder model of analysis. Such an analysis is inapplicable where, as here, there is no noncustodial parent. Thus, the truly joint-custodial parent opposing the removal is not saddled with any burden to come forward. Conversely, the joint-custodial parent desiring to remove the child must first petition the court to modify the residential parent status. In such a case, the burden remains on the parent seeking the modification and does not shift to the parent resisting the move to prove that the change would adversely affect the child.
The two parties here have enjoyed, until now, an unusual and unusually successful coparenting arrangement. The court can only rule and hope that somehow they will continue to cooperate for their son's continued benefit. The court denies the application of Dr. Voit to remove or modify physical custody of Garet. In so ruling, the court assumes the doctor will move. If he does, the court will make Mrs. Voit the primary residential parent, subject to a further motion or hearing to establish the specifics of Dr. Voit's alternative residential rights. If the doctor decides not to move, the present agreement of the parties shall continue.