759 A.2d 873 (2000)
334 N.J. Super. 361
Y. Yvonne CHEN, Plaintiff-Appellant,
v.
Howard HELLER, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 2000.
Decided October 18, 2000.
*874 Stephen P. Haller, Livingston, argued the cause for appellant (Skoloff & Wolfe, attorneys, Mr. Haller, of counsel; Nancy C. Richmond, on the brief).
Patricia Garity Smits, Morristown, argued the cause for respondent.
Before Judges NEWMAN, BRAITHWAITE and WELLS.
The opinion of the court was delivered by NEWMAN, J.A.D.
Plaintiff, Y. Yvonne Chen, appeals from an order denying her application to remove her two daughters from this State to Texas where plaintiff lives and works, and denying transfer of primary residential custody to her. We now reverse, allowing the removal and direct the transfer of primary residential custody to plaintiff.

I.
On May 19, 1983, plaintiff and defendant, Howard Heller, were married in New Jersey. Two children were born of the marriage: Katherine Anne Heller ("Katy"), born August 11, 1986, and Rebecca Lynn Heller ("Becky"), born February 8, 1990.
Both parties are electrical engineers and worked together during their marriage, first, at Singer-Kearfott (now GEC-Marconi) and, then, at Bell Labs (now Lucent Technologies). In 1991, plaintiff took *875 a leave of absence from Bell Labs to pursue a teaching position at the college level. She obtained a tenure-track job as an assistant professor at the New Jersey Institute of Technology (NJIT) beginning in the Fall 1991 semester. In 1992, plaintiff resigned her position at Bell Labs, rather than extend her leave of absence.
In 1992, plaintiff informed defendant that she wanted a divorce. The parties initially worked out a shared parenting agreement on their own when plaintiff moved out of the marital home. Plaintiff and defendant maintained separate homes for the children and shared custody and parenting responsibilities after the parties separated. The parties met with a psychologist and agreed upon a joint custody arrangement, the terms of which were incorporated into a Property Settlement Agreement.
The parties were divorced pursuant to a Dual Final Judgment of Divorce filed on August 9, 1993. An amended judgment of divorce was filed on September 29, 1993, and incorporated the written Property Settlement Agreement (Agreement) entered into by the parties. The Agreement provided that the parties were to enjoy joint legal custody of the two minor children. Pursuant to the Agreement, the children were to be in defendant's care alternate weekends from Friday to Sunday, two evenings per week, for two weeks during their summer vacation, and such additional time as the parties agreed. The Agreement also provided: "The parties agree that this schedule and corresponding support may change due to a change in employment or a home in residence. The parties agree they shall try to mediate these issues before returning to court in the event of a change."
After the parties' divorce, plaintiff continued teaching at NJIT. On or about May 4, 1994, plaintiff was given a one-year contract by NJIT for the 1994-1995 academic year, and she was informed that her contract would not be renewed for the academic year beginning in September 1995. According to defendant, plaintiff did not inform him that the 1994 academic year would be her last at NJIT or that she needed to find a job. According to plaintiff, she searched for an engineering or university teaching position, but was "unsuccessful in finding a comparable position between June of 1995 and December of 1995." Plaintiff did teach one night course at NJIT in the Spring of 1996, but she was informed that her teaching contract would not be renewed.
In early February 1996, plaintiff began discussing job opportunities with her brother who had started a "high-technology" company called Stream Technologies Incorporated ("STI") in Austin, Texas. In June 1996, plaintiff was presented with an employment contract from STI. The contract was predicated on plaintiff being physically present at STI in Texas. Apparently, plaintiff's attempt to work for STI by "tele-commuting" from New Jersey had been unsuccessful because "it was technically impossible for plaintiff to design and physically help build a machine from 1800 miles away."
By letter dated July 25, 1996, plaintiff informed defendant that she had accepted a job offer with STI in Austin, Texas, that she would be starting work on August 15, 1996, and that she would like the children to live with her, in Texas, during the school year. Upon receipt of plaintiff's letter on July 27, 1996, defendant telephoned plaintiff and informed her that he opposed her plan to relocate to Texas with the children. Defendant also sent plaintiff a letter, dated July 29, 1996, in which he expressed his feelings and concerns, and explicitly stated that he had not given plaintiff permission to remove the children from New Jersey and that she would need a court order to do so.
On or about September 6, 1996, plaintiff filed an order to show cause, requesting that the court allow her to relocate to Texas with the minor children, permit her to immediately enroll the children in school *876 in Texas, and restrain defendant from "assuming physical custody of the children during the time period when Plaintiff is compelled to return to Texas to tend to business matters[.]" On September 9, 1996, the trial judge entered an order scheduling oral argument for September 17, 1996, and reserving decision on the matter pending a hearing.
On or about September 13, 1996, defendant filed a cross-motion, opposing plaintiff's application and seeking relief.
Oral argument was heard by the trial judge on September 17, 1996. The judge questioned plaintiff's attorney as to why the parties had not participated in mediation in an attempt to resolve this dispute, as required by the terms of the Agreement. Counsel responded that, because "there is no middle ground that the parties have at least articulated to counsel[,]" mediation was not appropriate. Because defendant was not willing to waive the mediation clause, the trial judge ordered that the parties attend mediation and that mediation be completed by October 11, 1996.
The judge denied plaintiff's request for a psychological evaluation of the children, finding that there was no need for such at that time. The trial judge denied plaintiff's request to enroll the children in school in Austin, Texas. The judge also stated that, as of that moment, both parties were precluded from discussing any possible relocation or litigation with the children, and, if either party discussed the matter with the girls, the judge would impose sanctions. The trial judge granted defendant's request that, if plaintiff is out of New Jersey for more than twenty-four hours, defendant would have physical custody of the children during that time. The judge also granted defendant's request that plaintiff be restrained from removing the children from New Jersey without the written consent of defendant or order of the court. The trial judge denied the request that defendant's child support obligation be terminated. Finally, the judge scheduled a hearing on this matter. The judge memorialized his decision in an order filed on March 5, 1997.
A plenary trial was held at various dates over a protracted time period. Plaintiff testified as to her alleged inability to find employment in New Jersey prior to accepting her position at STI. Plaintiff testified that, in June 1995, she began receiving unemployment. Based on the recommendation of counselors at the Division of Unemployment Security, plaintiff enrolled in a computer training course in September 1995. After finishing the course in February 1996, plaintiff considered teaching part-time at NJIT and local community colleges. At that same time, plaintiff's brother had started STI and told plaintiff that, when his business picked up, perhaps she could work for him from New Jersey as a part-time consultant.
According to plaintiff, she did not mention anything to defendant about possibly moving out of state with the children because "it was never on [her] mind. [She] didn't even want to move to Texas...." At that time, plaintiff was teaching one course at NJIT, but her contract was not renewed.
After visiting her brother in Austin in June 1996, and seeing STI, plaintiff decided that, although accepting the job in Texas with STI would be a "major change," it would also be a "great opportunity." Plaintiff testified that her entire family is in Texas and that her parents intended to move to Austin from Houston if the children relocated to Texas in order to assist plaintiff with daycare and transporting the children. Plaintiff also testified that STI is located approximately fifteen minutes from her home in Austin, and she could maintain a very flexible schedule to be with the children. The house she purchased in Austin has four bedrooms, is in a good neighborhood, and the school system received the state's highest rating. The development plaintiff lives in has a community swimming pool, a tennis court, and a playground.
*877 According to plaintiff, the computer industry is rapidly growing in Austin and STI is involved in designing smaller, faster computer chips. Plaintiff testified that she now has 25,000 shares of STI stock, giving her an ownership interest in the company.
When asked how she planned to encourage and facilitate the children's Jewish faith and education if they resided with her in Texas, plaintiff responded that she would drive them to Hebrew school and take them to synagogue. Plaintiff also stated that her parents have offered to help her in that regard. Plaintiff stated that if the children live with her in Texas, it is her intention to raise them in the Jewish faith.
Plaintiff stated that, in January 1997, while on the phone with Becky, she overheard defendant telling Katy that she was not to call plaintiff without his permission. Katy got on the phone and informed plaintiff that defendant told her that if she ever called plaintiff without his permission, first he would remove all the phones in the house except the one in his room, and then he would call the phone company and have plaintiff's number blocked from his line. Plaintiff testified that when the children are at her home in Texas they have "blanket permission" to call defendant whenever they want.
Plaintiff insisted that she did not move to Texas in order to inhibit or frustrate defendant's contact with the children. She testified that if the children lived with her in Texas, she considered it "very important" for them to have continuing contact with defendant. She felt that if the children lived with her during the school year, "they should spend vacation, school holidays with their father[,]" and defendant should come to Texas to visit them. According to plaintiff, both children have told her that they miss her and want to live with her in Texas.
Mary Ellen Woodstock, Katy and Becky's school guidance counselor, testified for plaintiff. According to Woodstock, Katy has made it "very clear" that she would like to be with her mother. Becky did not indicate to Woodstock that she wants to stay with her mother, and Woodstock did not ask her if that was the case.
In February 1997, Woodstock referred Katy and Becky to Brenda DiPietro, a psychotherapist, who testified at trial on behalf of defendant. She had met with Katy and Becky and observed them with defendant. According to DiPietro, the children were "[w]arm, engaging, ... comfortable, pleasant, ... [and] affectionate with [defendant.]" The trial judge discounted her testimony, however, finding that she "came into [the] courtroom with her own private agenda. She was not objective, but biased. She took offense at the fact that anyone would question either her qualifications or her conclusions.... [The judge] found her not to be a very credible, reliable witness."
On May 22, 1997, plaintiff offered the testimony of Dr. Mathias Hagovsky, a psychologist. During the preliminary examination of Dr. Hagovsky, the trial judge revised his earlier position, finding that he had been mistaken in not ordering the parties to submit evaluations. The judge, sua sponte, permitted each party to have his or her own expert conduct an evaluation as to the issues of removal, custody, parenting time, and the best interests of the children.
Dr. Hagovsky testified again in June 1998, and his report was admitted into evidence. According to Dr. Hagovsky, plaintiff "appears more concerned about [defendant's] emotional well being than that of the children insofar as she is convinced that the girls would not suffer appreciably from a move. To her, then, this is a matter of how she can assure that the girls and their father will continue in their relationship once the transfer is made[.]" Dr. Hagovsky did not find anything to indicate that plaintiff's desire to relocate with the children was made in an effort to frustrate defendant's rights to parenting *878 time or the children's right to have a relationship with their father.
According to Dr. Hagovsky, the children reacted very positively with their mother. The doctor found that "the children were very comfortable with their mom, that they invited each other's participation, that they were responsive to each other and to [plaintiff], they were happy to be with [plaintiff], that [plaintiff] exerted a calm but controlling influence on the children in terms of their little occasional squabbles over the game playing." Dr. Hagovsky found that there was a significant bond between plaintiff and her daughters.
Both girls told Dr. Hagovsky that they want to move to Texas to live with their mother. Katy stated that she is much more comfortable with her mother and her mother's family than with her father and his family and that she does not feel comfortable talking to her father about "things that are really important...." Becky told the doctor that she does not feel comfortable living with her father.
When asked whether he had "an opinion as to where the children's best interests lie in terms of their residence in the future[,]" Dr. Hagovsky replied:
It appears to me a much stronger press of variables from the data that the children feel more comfortable with their mom, want to be with her, are affected by not being with her, are young girls growing, and likely to respond to that issue of girls needing, wanting ... to be with their mother as they get older. It seems to me that certainly as time progresses, the need for them to be with their mother grows stronger.
So, to the best of my knowledge given the information that's available, I would say that [it] is a greater probability right now that they would be better off with their mother as a residential parent, then [sic] with their father.
According to defendant, the girls did not act as they normally do with him when they were in front of Dr. Hagovsky.
Defendant's testimony largely concerned his relationship with plaintiff and the early years of their marriage. According to defendant, after the parties' divorce, but prior to 1996, he and the children were close and did many things together. Defendant stated that he "was doing everything a parent needs to do to take care of the children. [He was] feeding them, getting them ready for school, making sure they [did their] homework, taking them to school, participating in school activities, taking them to doctor appointments, planning things, fun things or cultural things for the weekends, visiting friends and family." Defendant testified that he encouraged a relationship between the children and plaintiff.
Defendant stated that, prior to receiving plaintiff's July 1996 letter informing him that she was moving to Texas, he did not know that she had been terminated from her job at NJIT and was looking for another job. According to defendant, the children already knew about plaintiff's intention to move, but had kept it a secret from him.
Defendant testified concerning plaintiff's allegation that he threatened to block her phone number if the children called her without his permission. According to defendant, in January 1997, he overheard Katy on the phone, telling plaintiff "call back, let it ring once and hang up." Defendant heard the phone ring and then heard Katy call plaintiff back. Defendant concluded that plaintiff and Katy had "figured out a way that it [could] sound like [plaintiff] call[ed defendant], but [defendant would] wind up with the phone bill." When defendant confronted Katy about making a phone call, Katy lied and told defendant that plaintiff had called her. Defendant admitted stating that he would block plaintiff's phone number, but he insisted that he did not mean it and only said *879 it because he was angry that Katy had lied to him.
Defendant testified that he has been the sole custodial parent since January 1997. When asked whether the parenting time schedule proposed by plaintiff was a reasonable schedule for him, if the girls lived with plaintiff in Texas, or for plaintiff, if the girls remained in New Jersey with him, defendant responded that it was not. According to defendant, the schedule was unreasonable for the following reasons:
[F]irst it requires a lot of traveling by the girls. A lot of these weekends are the major travel days where it would be difficult or extremely expensive to ... pay for the airfare. It's a huge effort of traveling back and forth.
....
[Second, t]his schedule shows [the children] miss more than a few days of school, that concerns me.... Also, this doesn't support the day-to-day interaction that ... we have ... had.
Defendant also testified that if the children were permitted to move to Texas, even if he followed the parenting time schedule proposed by plaintiff, that would not allow him to maintain the same or a similar relationship with the children. Defendant was of the view that if the children remained in New Jersey and plaintiff remained in Texas, the children would "definitely maintain the relationship with [plaintiff] through summer and holiday visits, as well as regular phone calls[.]" However, defendant believed that if the children moved to Texas, they would not be able to maintain their relationship with him through summer and holiday visits, as well as regular phone calls. Defendant explained that he does not "get the reciprocal respect that [plaintiff] supports [his] relationship with [the children]. It keeps getting undermined and limited[.]"
Defendant also expressed concerns about whether plaintiff would raise the children Jewish if they were permitted to move to Texas. Defendant stated, "[a]side from what [plaintiff] said on the stand, everything else she has done has been totally contrary to [raising the children Jewish]."
Arnold Siegel, an electrical engineer who had worked with plaintiff and defendant, testified for defendant. Siegel testified that there were several electrical engineering positions available at GEC-Marconi (GEC) (formerly Singer-Kearfott) in 1995 or 1996. According to Siegel, prior to the fall of 1996, he never received a telephone call from plaintiff or any recruiter or friend on plaintiff's behalf indicating plaintiff was looking for a job. Siegel never received plaintiff's resume prior to the fall of 1996.
Siegel stated that, some time in 1996, defendant contacted him and informed him that plaintiff was looking for a job. Defendant sent Siegel plaintiff's resume, which Siegel reviewed. He then forwarded the resume to the Human Resources Department and asked them to contact plaintiff and schedule an interview. The position available at GEC was for "a control systems engineer to design an antenna positioning system."
According to Siegel, plaintiff did not appear at her scheduled interview. Plaintiff later telephoned Siegel and explained that she did not go to the interview because "she had already put a plan into motion to move to Texas to be with her family."
Plaintiff testified that, although defendant had helped to get her an interview at GEC in December of 1996, she had already accepted the job with STI and had purchased a home in Texas, and GEC informed her that they would not pay to relocate her back to New Jersey.
Patricia Greene, an electrical engineer who worked at Bell Labs with the parties and has known them for more than ten years, also testified for defendant. Greene testified that plaintiff and defendant shared parenting responsibilities. In Greene's opinion, defendant "had an extraordinary affectionate relationship with *880 his kids. They were always hanging on his arm or sitting in his lap." According to Greene, she never observed any antagonism between Katy and defendant prior to 1996. Greene testified that she saw "very dramatic changes" in Katy, particularly in the way she treated defendant, at the time plaintiff left for Texas. Greene stated that Becky imitated Katy's behavior toward defendant, but was "more freely affectionate with her father" when Katy was not in the room. Greene thought that defendant's relationship with both children improved the year after plaintiff left for Texas.
Although he did not testify, the report of defendant's expert, Dr. Robert Clyman, a psychologist, was admitted into evidence. With regard to the children's best interests, Dr. Clyman concluded:
I believe that the children's best interests would be served by [plaintiff's] return to New Jersey. In this way, they would have substantial, ongoing contact with both parents who each have a great deal to offer them. If [plaintiff] truly needed to move to Texas, it would probably make sense for the children to accompany her, since her parenting skills appear to be at least as impressive as [defendant's], and the children are more strongly bonded with her. Since clinical research indicates that mothers, all things being equal, are in a better position to help socialize their daughters through adolescence, that would be another argument in favor of the move.
According to defendant, the girls did not act as they normally do with him when they were in front of Dr. Clyman.
On February 24, 1999, the trial judge rendered an oral decision. The judge began by noting that both children "would prefer, at this time, to be permitted to move to Texas to be with their mother." The judge also stated that both plaintiff's expert, Dr. Hagovsky, and defendant's expert, Dr. Clyman, recommended that the children be permitted to relocate to Texas with their mother.
The trial judge then set forth the requirements that must be satisfied in order to permit the removal of a child from New Jersey. First, the parent wishing to move out of state with the children must establish a sincere, good faith reason for the move. The court must then determine whether the move would be contrary to the best interests of the children, whether the move would adversely affect the parenting rights of the other party, and whether the move requires a substantial change in the parenting time of the parent who would not have custody of the children. The court must also consider the advantages of and reasons for the move and the development of a reasonable parenting time schedule. Finally, the court must determine whether the non-custodial parent would be able to relocate.
The trial judge stated that he was satisfied that plaintiff, in good faith, relocated to the State of Texas. The judge noted, however, that he was also satisfied that, based on defendant's testimony, there would have been employment opportunities for plaintiff in New Jersey if she wished to avail herself of those opportunities. The trial judge found that plaintiff did not fully explore the employment possibilities in New Jersey. The judge did not find that one school system, New Jersey or Texas, is superior to the other, and the judge believed that "these two girls would do well no matter where they attended school." The trial judge was also satisfied that, although plaintiff has reverted to her Christian faith, she is sincere in her intention to maintain and educate the children in their Jewish faith.
The trial judge determined that "[t]here's no doubt that these girls would benefit from being with their mother, especially at their age[s]." The judge opined, however, that, if he were to permit the children to relocate to Texas, even with the "extremely liberal visitation schedule" proposed by plaintiff, defendant's "visitation or parenting rights with the children would be adversely and seriously affected." *881 The judge stressed that defendant "is not a father-come-lately[, rather h]e's been intimately involved with his daughters' activities.... [Defendant] has been both father and mother to these children and I think he's done an excellent job."
The trial judge next addressed whether defendant would be able to relocate to Texas. The judge determined that, based on the time defendant has invested in his present job and the benefits and seniority he has achieved there, it would not be appropriate for the court to expect defendant to give up his job in New Jersey and relocate to Texas. The trial judge concluded:
There's no doubt in my mind that if I allowed the children to go to Texas, even with the extremely generous, liberal visitation schedule proposed by [plaintiff], that there would be a substantial change in the relationship between the father and the children.
He would change from a parent who's had constant, continuous contacts with the children to an absentee father whose time with the children would be limited to school recesses, school vacations, long weekends, and an occasion[al] trip by the father to the State of Texas.
There is no way, given the relationship that has existed up to this point between the children and the father, that any visitation schedule could compensate for the children's relocation to the State of Texas.
The trial judge denied plaintiff's application to remove the children from New Jersey. The judge noted that, as part of his decision, he was "going to take the visitation schedule, the parenting time schedule, ... that was proposed by [plaintiff] and give her the same schedule to the degree that it's consistent with the children's school calendar here in the State of New Jersey." The judge also stated that he would like to see each parent install video conferencing equipment in their respective homes.
On April 30, 1999, the trial judge entered an order denying plaintiff's request to remove the children from New Jersey to Texas. The trial judge also ordered that the parties continue to have joint legal custody of the children, with defendant having primary residential custody; that plaintiff have parenting time with the children on the same schedule as she proposed for defendant, to the extent that schedule is consistent with the children's New Jersey school schedule; that each party set up computer-assisted video conferencing in their respective homes at their own cost "to facilitate continued contact for the children with each [parent;]" and that the parties confer, through counsel, as to issues regarding child support and payment of other child related expenses.

II.
On appeal, plaintiff contends that the trial judge erred in denying her request to remove the parties' two children to the State of Texas because "expert testimony revealed that it is in the children's best interests to reside with plaintiff ... in Texas[;]" "[p]laintiff had a sincere, good faith reason to remove the children to the State of Texas and the move would not be inimical to the best interests of the children[;]" and "[t]he evidence on the Court record revealed that the children would not suffer from moving to Texas with plaintiff and that they would be able to maintain an ongoing, continuous relationship with their father."
The law of removal begins with N.J.S.A. 9:2-2, which provides, in pertinent part:
[When] children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction ... without the consent of both parents, unless the court, upon cause shown, shall otherwise order.
The Supreme Court cases of Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (1984), and Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988), have guided our courts in applying and interpreting N.J.S.A. 9:2-2.
*882 Both cases involved situations where a custodial mother sought removal of her child from New Jersey over the objections of the noncustodial father.
In Cooper, the Court established that a court must weigh the following interests in any removal case: the moving parent's freedom of mobility, the interests of the objecting parent, and the best interests of the child. Cooper, supra, 99 N.J. at 55-56, 491 A.2d 606. The Court concluded that the purpose of N.J.S.A. 9:2-2 is "to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship." Id. at 50, 491 A.2d 606. The Court in Cooper "incorporated a consideration of the well-being of the custodial parent into its consideration of the best interests of the child[,]" Voit v. Voit, 317 N.J.Super. 103, 116, 721 A.2d 317 (Ch. Div.1998), stating:
The realities of the situation after divorce compel the realization that the child's quality of life and style of life are provided by the custodial parent. That the interests of the child are closely interwoven with those of the custodial parent is consistent with psychological studies of children of divorced or separated parents....
Because the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account.
[Cooper, supra, 99 N.J. at 53-54, 491 A.2d 606.]
In Cooper, the initial burden was placed on the custodial parent to show "a real advantage" to the proposed move. Id. at 56, 491 A.2d 606. However, that burden was not a heavy one because the advantage "need not be a substantial advantage but one based on a sincere and genuine desire of the custodial parent to move and a sensible good faith reason for the move." Ibid. Once that threshold showing was made by the custodial parent, the trial court had to consider three factors: (1) the prospective advantages of the move; (2) the integrity of the motives of the parents; and (3) "whether, under the facts of the individual case, a realistic and reasonable visitation schedule can be reached if the move was allowed." Cooper, supra, 99 N.J. at 56-57, 491 A.2d 606.
In determining whether a parenting time schedule was reasonable, the burden was placed on the noncustodial parent. Id. at 57-58, 491 A.2d 606. The Court stated:
Since the noncustodial parent has the necessary information to demonstrate that an alternative visitation schedule is not feasible because of distance, time, or financial restraints, we place the burden on that parent to come forward with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child. We emphasize that more than a showing of inconvenience by the noncustodial parent is required to overcome a custodial parent's right to remove the children after he or she has met the threshold showing that the move would be a real advantage to him or her and would not be inimical to the best interests of the children.
[Ibid.]
The Court continued: "If, however, the noncustodial parent does present evidence that his or her relationship and visitation with the children would be adversely affected by the move, then the trial court must balance the competing interests of the parties." Id. at 58, 491 A.2d 606.
In Holder, supra, the Court modified the Cooper standard, making it easier for a custodial parent to prevail in an application for removal. Voit, supra, 317 N.J.Super. at 118, 721 A.2d 317. In Holder, the Court followed the custodial/noncustodial distinction of Cooper, but modified the burden on the moving parent by eliminating the "real advantage" requirement for removal and *883 replacing it with the less burdensome "good faith reason" standard. Holder, supra, 111 N.J. at 352-53, 544 A.2d 852. The Holder Court "left the burden on the noncustodial parent to show that no alternative visitation plan could be established that would adequately protect the relationship between the child and the noncustodial parent." Voit, supra, 317 N.J.Super. at 118, 721 A.2d 317 (citing Holder, supra, 111 N.J. at 353, 544 A.2d 852). The Court made clear:
Not every change in a visitation schedule will prejudice th[e rights of the noncustodial parent], particularly if the noncustodial parent has not exercised them before the custodial parent seeks to move from the state. If the move will not substantially change the visitation rights, then the court should determine whether the move would be inimical to the best interests of the children.
[Holder, supra, 111 N.J. at 353, 544 A.2d 852 (emphasis added).]
Thus, in Holder, "the burden on the custodial parent to justify removal was lessened, but the burden on the noncustodial parent was retained and intensified." Voit, supra, 317 N.J.Super. at 118, 721 A.2d 317.
Defendant argues that the Court's holdings in Cooper and Holder are not directly on point because here, unlike in those cases, plaintiff and defendant have joint legal and residential custody of the children and both share in parenting responsibilities. Defendant is correct and in that regard, the opinion in Voit, supra, is instructive.
In Voit, the court addressed a situation similar to that presented here. There, the divorced parents shared "joint legal and physical custody" of their son. Voit, supra, 317 N.J.Super. at 109, 721 A.2d 317. Specifically, the plaintiff, Dr. Gregory Voit, was to have the child in his care each week from Thursday evening at 6:00 p.m. through Monday morning at 9:00 a.m. Ibid. The defendant, Lisa Voit, was to have their son in her care for the rest of the week. Ibid. Testimony revealed that the parties deviated from this schedule in order to maximize the child's time with each parent. Ibid.
When Dr. Voit was offered a position at a teaching hospital in Arizona, he first asked Lisa Voit to relocate with him and their son to Arizona. Id. at 111, 721 A.2d 317. When discussions between the parties ceased, Dr. Voit, through his lawyer, sought the defendant's approval to move with their son. Ibid. Dr. Voit proposed, first, that Lisa Voit relocate with him and their son to Arizona so that the parties could continue their "coparenting arrangement." Ibid. Alternatively, if the defendant did not wish to relocate to Arizona, Dr. Voit offered to pay for a visitation arrangement in which their son would spend complete summers and all extended school vacations with Lisa Voit. Id. at 111-12, 721 A.2d 317.
Dr. Voit filed a notice of motion requesting the right to remove his son to Arizona and a change in the custody agreement so that he would have residential custody of the child during the school year. Id. at 121, 721 A.2d 317. The court determined:
[U]nder the unique facts of the instant case, where both legal and physical custody is truly shared, the Cooper/Holder analysis, with its concomitant burden on the parent resisting the move out of state to come forward with evidence that a proposed alternative visitation schedule would be impossible or unreasonably burdensome, is inappropriate. While much of the reasoning of those cases applies, the placing of such a burden of proof on the parent resisting the move would be unfair given the totally shared-parenting arrangement that has to date been engaged successfully by the parties herein.
[Id. at 106, 721 A.2d 317.]
The court continued that, in a successful shared-parenting case, there is no inequality between the parents' contributions to the child's best interest. Id. at 119, 721 *884 A.2d 317. Thus, because "the whole thrust of Cooper and Holder is, where a request for removal is made by a custodial parent, to prioritize the rights of the custodial parent and then to accommodate, as much as possible, the lesser rights of the noncustodial parent[,]" application of a Cooper/Holder analysis in the shared-parenting context "would be both artificial and inappropriate." Ibid.
The court interpreted the case as being one involving "first and foremost a request for modification of a joint legal and physical custody agreement." Id. at 121, 721 A.2d 317. Therefore, the court framed the issue as whether there should be a change in custody. Ibid. The court concluded that, in order to determine whether good cause exists to permit removal in a "true joint-parenting case," the standard appropriate to applications for a change in custody, that is the best interests of the child standard, must be applied. Ibid.
In custody modification cases, the burden is on the party seeking modification to show that, "due to a substantial change in circumstances from the time that the current custody arrangement was established, the best interests of the child would be better served by a transfer in custody." Ibid. (citing Todd v. Sheridan, 268 N.J.Super. 387, 398, 633 A.2d 1009 (App.Div.1993); Mastropole v. Mastropole, 181 N.J.Super. 130, 136, 436 A.2d 955 (App.Div.1981)). The primary consideration of the court in assessing whether the parent seeking modification has met his or her burden is the best interests of the child. Ibid. Notably, in assessing the best interests of the child, "the court does not compare the status quo shared-parenting arrangement ... with relocation." Id. at 122, 721 A.2d 317.
In Voit, as here, the court found that the plaintiff's reason for her move met the minimal "good faith reason" standard of Holder. Ibid. Also in Voit, the court found that the plaintiff was not requesting to move in order to interfere with the defendant's parental rights. Ibid. Applying the best interests of the child standard, the court concluded that Dr. Voit had not met his burden. Ibid. The court stated that Dr. Voit "utterly failed to show it is in [his son's] best interest to be in Arizona with him as opposed to in New Jersey with [Lisa] Voit." Ibid.
Here, plaintiff contends that "defendant failed to meet his burden to show that an alternate parenting time schedule would be impossible or so burdensome as to unreasonably and adversely affect his relationship with the minor children." However, following the rationale in Voit, in a shared-parenting case, no such burden should be placed on defendant. Id. at 119-20, 721 A.2d 317 Rather, plaintiff should bear the burden of proving that the best interests of the children would be better served by a transfer in custody. Id. at 121, 721 A.2d 317.
Plaintiff asserts that she satisfied the test set forth in Voit. We agree. Both plaintiff's and defendant's experts concluded that living with plaintiff in Texas was in the girls' best interests. Both experts determined that the girls are more strongly bonded with plaintiff and feel more comfortable with her. In addition, both noted the need for the girls to be with their mother as they get older.
In reaching his decision, the trial judge recognized that both children would prefer to live with their mother in Texas; that both experts recommended that the children be permitted to relocate to Texas with their mother; and that "[t]here is no doubt that these girls would benefit from being with their mother, especially at their age[s]." See Palermo v. Palermo, 164 N.J.Super. 492, 499, 397 A.2d 349 (App. Div.1978) (stating that "the `opinions' or expressed preference of the child to live with [one parent over the other are] not controlling[, b]ut it is one of the factors which may properly influence the trial judge's decision"). Nevertheless, the trial judge denied plaintiff's application for removal solely on his conclusion that, "if [he] *885 allowed the children to go to Texas, even with the extremely generous, liberal visitation schedule proposed by [plaintiff], ... there would be a substantial change in the relationship between the father and the children." The trial judge was mistaken in reaching his decision, by undervaluing the best interests of the children. Regardless of whether the test set forth in Voit or Holder is applied, "the beacon remains the best interests of the child." Holder, supra, 111 N.J. at 354, 544 A.2d 852; see Voit, supra, 317 N.J.Super. at 121, 721 A.2d 317.
Plaintiff has shown that, due to a substantial change in circumstances from the time the custody arrangement was established, that is, her move to Texas, for which the court concluded plaintiff had a "good-faith" reason, the best interests of the children would be better served by a transfer of residential custody. Therefore, plaintiff met her burden under the approach set forth in Voit, which we expressly approve. She should be permitted to remove the children from New Jersey.
Even, however, if we did not apply the best interests of the child standard, plaintiff satisfied the burden imposed on her under the standard set forth in Cooper as modified in Holder.
Defendant argues that, assuming that the test set out in Holder is applicable to this joint-parenting case, the trial court was correct in denying plaintiff's application to relocate because "[t]he trial court recognized that it could not possibly fashion a schedule for [defendant] that would not adversely affect his co-parenting rights." We disagree.
Pursuant to Holder, supra, "[o]nce the court finds that the custodial parent wants to move for a good-faith reason, it should then consider whether the move will be inimical to the best interests of the children or adversely affect the visitation rights of the noncustodial parent." Id. at 353, 544 A.2d 852. Here, the trial judge determined that plaintiff had a good faith reason for relocating. That decision is supported by the record and is consistent with the Court's finding in Holder that the plaintiff's "motivation ... to live closer to her relatives and to make a fresh start in life[ ] ... clearly was a sufficient explanation to justify her move to Connecticut." Ibid. The trial judge further concluded, and the record supports, that the move would not be inimical to the best interests of the children, stating that "[t]here is no doubt that these girls would benefit from being with their mother, especially at their age[s,]" and recognizing that both experts recommended that the children be permitted to relocate to Texas with their mother.
The trial judge also concluded, however, that the move would "substantially change... the relationship between the father and the children." However, the analysis should not have stopped there. In Holder the Court stated:
If ... the move will require substantial changes in the visitation schedule, proofs concerning the prospective advantages of the move, the integrity of the motives of the party, and the development of a reasonable visitation schedule remain important. The emphasis, however, should not be on whether the children or the custodial parent will benefit from the move, but on whether the children will suffer from it. Motives are relevant, but if the custodial parent is acting in good faith and not to frustrate the noncustodial parent's visitation rights, that should suffice. Maintenance of a reasonable visitation schedule by the noncustodial parent remains a critical concern, but in our mobile society, it may be possible to honor that schedule and still recognize the right of a custodial parent to move. In resolving the tension between a custodial parent's right to move and a noncustodial parent's visitation rights, the beacon remains the best interests of the children.
[Id. at 353-54, 544 A.2d 852.]
Although the trial judge described the parenting time schedule proposed by plaintiff *886 as "extremely generous[ and] liberal[,]" he allowed the effect the move would have on defendant's relationship with his children to trump the other significant considerations when it should have been the other way around. Put another way, the trial judge mistakenly drew the wrong conclusion from his own findings of fact.
A word about the parenting time schedule. The one proposed by plaintiff was, to repeat the trial judge's own words, "extremely generous" and "liberal." Defendant objected to the parenting time schedule proposed by plaintiff, however, arguing that "[n]o realistic schedule can even come close[ ]" to the "day-to-day interaction Katy and Becky have always enjoyed with [defendant]." Plaintiff proposed that the children visit defendant in New Jersey "during all of their extended holidays from school including winter break, spring break and the entire summer with the exception of the first two weeks after school ends or the last two weeks prior to school recommencing," during "any long weekend break that the children have during the school year[,]" and any time defendant wished to travel to Texas. Defendant, however, emphasized the cost and length of trips to and from Texas. While nothing can be done to shorten the actual distance between Texas and New Jersey, plaintiff, in her proposed parenting time schedule, offered to "equally share any and all transportation costs for the children to travel to and from New Jersey and/or Florida [where defendant's parents reside during a portion of the year] to see their father[ ]" and, if defendant wished to travel to Texas, "to make reasonable contributions to [defendant's] airfare and accommodations up to four times per year, for a period of no more than eight nights (total per year)."
Plaintiff's parenting time schedule also provides that defendant and the children will maintain daily contact through "unlimited" phone calls, "unlimited computer access," and "video imaging." Plaintiff will, if possible, give defendant thirty to forty-five days notice of any and all special events for the children. If defendant is unable to attend, plaintiff will videotape the event and send the tape to defendant. Plaintiff will provide defendant with all documents pertaining to the children "as soon as she receives them[,]" including school calendars, report cards, and medical records. Plaintiff will also "involve [defendant] and (if he desires) his family in the planning of the girls' Bas Mitzvahs and ... arrange the affair at a mutually agreeable date and time."
Although defendant's parenting time will be adversely affected if the children move to Texas, plaintiff has shown compelling reasons for the move. Further, even though this schedule is not defendant's "ideal," it was what plaintiff had to utilize while the children remained in this State with their father during the school year. It will now be defendant's parenting time schedule and we expressly adopt the entire submission set forth in plaintiff's attorney's letter of September 15, 1998 to the trial judge and fully expect plaintiff to abide by both its letter and spirit.
We, therefore, reverse the order of April 30, 1999 insofar as it denied plaintiff's application to remove the parties' two minor children from New Jersey to Texas and transfer primary residential custody to plaintiff. Plaintiff is permitted to remove the children from New Jersey to Texas and is awarded primary residential custody of the children. The removal shall be effectuated during the school break during the holiday season and no later than December 31, 2000, and the children shall be enrolled in the school system in Austin, Texas beginning in January 2001. Defendant shall have parenting time with the children pursuant to the schedule proposed by plaintiff as contained in plaintiff's attorney's letter dated September 15, 1998. Each party is directed to set up video conferencing in their respective homes at their own cost. We remand to the Family *887 Part for entry of an order consistent with this opinion. Jurisdiction is not retained.