# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1671-24

M.G.I.M.,[1]

    Plaintiff-Respondent,

v.

K.Z.,

    Defendant-Appellant.

_____

Argued February 2, 2026 – Decided February 25, 2026

Before Judges Sabatino, Natali, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FM-20-1734-22.

Paul H. Townsend argued the cause for appellant (Townsend Tomaio & Newmark, LLC, attorneys; Paul

---

[1] We use initials to refer to the parties to protect their privacy and because we refer to records of proceedings arising under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, as well as medical and psychological records related to child custody and parenting time determinations. Those records are not subject to public disclosure under Rule 1:38-3(d)(3), (9), and (13).

H. Townsend, of counsel; Cynthia J. Lambo and Dean T. Bennett, on the briefs).

Tracy Julian argued the cause for respondent (Julian Smuro Law, LLC, attorneys; Tracy Julian, on the brief).

PER CURIAM

Defendant K.Z. challenges a December 26, 2024 Family Part order that granted plaintiff M.G.I.M.'s application for sole legal custody of the parties' two children and to relocate with them to Florida. After considering the parties' arguments against the record, including Judge Thomas J. Walsh's comprehensive and detailed seventeen-page written decision issued after a plenary hearing conducted over the course of seven days, we are unpersuaded by all of defendant's arguments and affirm.

I.

The parties met in 2013, married in 2016, and divorced in 2024. They have two minor children, a daughter and a son. As Judge Walsh observed, their marriage was animated by defendant's hostility, anger, and threats toward plaintiff. By way of example, in March 2022, a judge entered a temporary restraining order (TRO) against defendant based on a disturbing argument regarding the relatively commonplace decision of whether to take the parties'

A-1671-24

youngest child to the park in a stroller. In an audio recording of the incident, defendant threatened to kill plaintiff as their child cried in the background.

In April 2022, plaintiff voluntarily agreed to dismiss the TRO after defendant agreed to civil restraints. Those restraints restricted defendant's interactions with plaintiff and her parents, granted plaintiff the right to reside in the marital home and access to their family vehicle, and ordered defendant to participate in a court-approved anger management program. Later that month, plaintiff filed a complaint for divorce on the grounds of irreconcilable differences and extreme cruelty.

During the divorce proceedings, plaintiff obtained a second TRO, following a January 2022 incident during a parenting time exchange where the children were present, that culminated with defendant throwing a cup of water on plaintiff and threatening "this time water, next time acid." As a result of defendant's conduct which included the aforementioned incident along with his pattern of threatening behavior toward plaintiff and her parents, a second judge entered a February 22, 2023 final restraining order (FRO) against him after a hearing. The FRO limited communication between the parties to Our Family Wizard, a co-parenting application to manage child custody schedules.

3

The parties thereafter participated in mandatory mediation under <u>Rule</u> 5:5-6 in May 2023, which resulted in the entry of a June 26, 2024 matrimonial settlement agreement (MSA), which was incorporated into a final divorce judgment. The MSA resolved the issues of alimony and equitable distribution but bifurcated the relevant issues before us of custody, parenting time, and relocation. Pending resolution of the outstanding issues, the parties shared custody with plaintiff designated as the parent of primary residence. Plaintiff continued to remain in the former marital home, and defendant resided in a nearby town in an apartment. Pursuant to the terms of the MSA, defendant had visitation with the children on alternate weekends, Tuesday dinners, and alternate Thursday dinners.

A plenary hearing regarding the custody and relocation issues commenced in August 2024, and, as noted, continued intermittently over seven days and resulted with Judge Walsh issuing a written opinion and order on December 26. During the hearing, the judge heard the testimony of six witnesses, including plaintiff, defendant, plaintiff's parents, and her career strategist.[2] The witnesses

_____

[2] In rendering his decision, Judge Walsh did not rely on the opinion of the career strategist because he concluded the expert's testimony was "the very definition of a 'net opinion.'"

A-1671-24

generally detailed their background and relationship with the parties and the children, and further discussed the parties' abusive and tumultuous relationship.

During her testimony, plaintiff detailed the bases underlying her request for sole legal custody of the children and to relocate with them to Florida. Those reasons included issues of affordability, safety, education, and employment. Plaintiff also explained how at the beginning of their relationship, she believed she and defendant "share[d] a lot of values and visions," but tensions began when the parties' first child was born in December 2018.

She stated that following a serious health incident with their daughter, allegedly caused by her treating doctors in January 2020, defendant became extremely distrustful, controlled which doctors evaluated their daughter, and ignored plaintiff's input. Tensions escalated when plaintiff's parents began visiting because, according to plaintiff, defendant needed to "control . . . the house[hold] and things in the house and the way things were done regarding their daughter," and he did not trust her parents.

As the judge found, after plaintiff suffered a miscarriage in February 2020, defendant began incessantly insulting and using derogatory language toward plaintiff and her perceived incompetence, including during the birth of their son in May 2021. Plaintiff testified there was "a long-standing pattern . . . especially

5

after our kids were born, with a lot of th[ese] insults . . . . He became hypercritical of everything." She further testified she "felt complete disbelief that even in the actual moment of the birth of our son, he would still treat me like that."

Plaintiff, who was unemployed from March 2020 to at least the time of the custody trial, also testified as to her struggles in finding appropriate housing after she filed for divorce. As the children's primary caregiver, she stated she found it difficult to find a place that balances "affordability" with "finding a good-rated school in a safe area." She testified she had explored options in neighboring towns and even expanded her search but was unsuccessful in locating a residence that made "sense for us, both financially and looking at the whole package of schools and safety and stability."

Plaintiff also explained that when attempting to restart her career, she reached out to former colleagues and worked with a career strategist. She testified she applied to positions in Florida because "[i]t was . . . where the process" took her, after she began having "causal conversations with people in [her] network that had moved there and started offering local referrals." Her job search did not focus exclusively on Florida, however, as she applied to more

A-1671-24

than fifty jobs, including twenty-seven in the New York and New Jersey area and five remote positions.

At the end of her job search, she received an offer to become a vice president of marketing communications, with a salary of $155,000, plus a relocation bonus, with a company near Miami. She testified she received six interviews in total: four in Florida, one for a remote position, and just one "pre-screen" in New Jersey. With respect to her opportunity in New Jersey, she stated she did not receive an offer, and the position in Florida paid at least $20,000 more in compensation, not including her bonus, and was also a management-level position.

During her job search, plaintiff testified she also focused on locating an appropriate neighborhood for the children, while ensuring they maintained a relationship with their father. She researched family-friendly neighborhoods with strong schools in the Miami area.

Plaintiff stated moving to Florida and accepting the outstanding offer would represent a return to an "environment of peace" because she grew up in Florida and has more support there from both family and life-long friends. She also testified that she began thinking about a parenting calendar "that respects

A-1671-24

the amount of time he currently spends with the children" but is structured differently to avoid hostile exchanges.

Plaintiff admitted into evidence approximately thirty-four documents and ten audio exhibits, including text and recording exchanges between the parties from February 2018 through July 2024, which she contends "demonstrate[ed] the uncooperative, profane, and violent communication defendant used towards plaintiff." Indeed, many of these exhibits confirmed that defendant regularly referred to her in derogatory terms, and incessantly impressed upon her that she was incompetent, particularly because of her ethnic heritage. These exhibits also demonstrated the nature of defendant's threats of violence against plaintiff and her family. When confronted, defendant dismissed any concerns and explained they reflected mere cultural differences. Specifically, defendant testified these threats are part of his "culture" and insisted he grew up in a "war country," where it is "common" to speak this way.

Consistent with the incidents that lead to the TROs and FRO, the catalysts for defendant's outbursts were often seemingly mundane and normal decisions by plaintiff, such as setting the temperature in the house. Another incident, noted by Judge Walsh, involved their daughter's preschool graduation where defendant disagreed with how teachers handled the child's stage fright. In

8

response to the incident, defendant forcibly placed the child on the stage and threatened to "close the school if they play[ed] games with [him]."

Notably, Judge Walsh also heard testimony from a joint custody expert, Dr. Paul Dasher, who is a licensed psychologist with more than thirty years of experience. Dr. Dasher stated he regularly provides "best interests" evaluations and testified to the two "best interest" reports he rendered in this matter.

After conducting several diagnostic tests, collateral interviews with the family, and reviewing communications between the parties, Dr. Dasher stated plaintiff "was prone to working things out," and defendant was "very defensive." Dr. Dasher also testified that although plaintiff's results were generally reliable, certain indicators suggested "he was not necessarily being completely honest in answering [questions]."

With respect to plaintiff's parenting abilities, Dr. Dasher stated he perceived her to be "by any measure, a good parent . . . ." He testified the children responded to her favorably, and she presented as "being very kind and patient and calm." As to defendant's parenting abilities, Dr. Dasher observed "the children seemed very comfortable with him" and concluded their interactions with defendant were "as positive" as the interactions Dr. Dasher observed with plaintiff. Dr. Dasher, however, also testified defendant "was very

A-1671-24

derogatory" about plaintiff's ethnic background and possessed a "superiority complex . . . where he felt . . . his judgment was always better," especially with the children. He further testified defendant was "very intense" and exhibited a "significant amount of hostility, particularly toward his mother-in-law . . . ."

After the incident at the school, Dr. Dasher stated he spoke to the school employees and concluded defendant has a "highly impaired" ability to communicate. Dr. Dasher testified he was concerned defendant "might try to weaponize the children" and "felt entitled to bring them into the battle." He testified he did not "see how anything [is] going to get done for these children if it requires the cooperation of both parents." Based on these findings, Dr. Dasher concluded that the children should live primarily with their mother, she should have sole legal custody so long as defendant refuses to recognize his severe communication issues, and there would be substantial benefit to having her extended family nearby.

After considering the witnesses' testimony and the parties' written and oral submissions, Judge Walsh granted plaintiff's application for sole custody and removal of the children from New Jersey to Florida. With respect to custody, the judge made the following relevant findings pursuant to the fourteen factors

10

outlined in N.J.S.A. 9:2-4, which it later incorporated by reference into its removal analysis.

With respect to factor one, the parents' ability to agree, communicate, and cooperate in matters relating to the children, the judge found:

> There is no ability for these parties to communicate and cooperate. The overwhelming quantity of evidence shows that their capacity to communicate, cooperate, and agree as to the best interests of the children is completely nonexistent. As the [p]laintiff testified, credibly, any suggestions regarding plans or choices for the children are met with either silence, disagreement, or heavy criticism. These disagreements range from issues as minor as daily activities for the children to major decisions concerning their schooling and medical care.

As to factor two, the parents' willingness to accept custody, the judge concluded "[b]oth parents are willing to accept custody and parenting time." As to factor three, the relationship between the children and their parents, Judge Walsh concluded Dr. Dasher found both parents had a "healthy," "close," and "well-bonded" relationship with their children. With respect to factor four, the history of domestic violence, the judge outlined the extensive history of abuse between plaintiff and defendant, as supported by the text messages, audio recordings, and witness testimony at trial. He concluded, "this relationship was defined by relentless abuse of [p]laintiff by [d]efendant, which the FRO has

11

lessened but not abated. Moreover, the facts make clear that [d]efendant continues to take no responsibility for his behavior and rationalizes it away, blaming others."

With respect to factor five, safety of the children, the judge found, "despite his considerable issues," defendant is not a threat to the children. He also concluded plaintiff was not a threat. As to factor seven, needs of the children, he found the children are extremely young and "need complete care for all their daily needs." With respect to factor eight, stability of the home environment, the judge concluded plaintiff offers a "stable and safe home" and noted defendant "has expressed an interest in finding a more spacious accommodation."

As to factor eleven, geographical proximity of the parents' homes, the judge noted they reside close to each other currently, but plaintiff seeks to relocate. Regarding factor twelve, extent and quality of time prior to the separation, Judge Walsh observed before the separation, the children were regularly exposed to "strife, discord, and domestic violence." As to factor thirteen, parents' employment, he found plaintiff seeks to return to the workforce "that would undoubtedly result in fulltime childcare," and defendant can work

12

remotely. Finally, with respect to factor fourteen, age and number of children, the judge noted the children's young age.[3]

After making these findings, Judge Walsh noted that his decision to grant plaintiff sole legal custody was "not a difficult one." He further found that, in light of the "unabated history of domestic violence" and defendant's "absolute inability . . . to modify his behavior or even recognize any fault," he saw "no reason to believe that these parties will ever be able to effectively communicate let alone work together to make decisions in the children's best interest." Judge Walsh also observed that although plaintiff was willing to compromise and consider the opinions of other people, the evidence "at each and every turn" demonstrated defendant "neither trusts nor respects her opinion or anyone's . . . ." Judge Walsh also concluded defendant's reported threats to kill plaintiff and her family also supported his decision. Although defendant testified they were the result of cultural differences, the judge determined "there is no culture anywhere on earth where this would be acceptable behavior."

---

[3] With respect to factors six (children's preference) and nine (children's education), Judge Walsh observed neither were present nor applicable. With respect to factor ten (fitness of parents), Judge Walsh relied on his observations for the other factors and his additional discussion.

A-1671-24

Further, Judge Walsh also relied on Dr. Dasher's unrebutted expert testimony, who the judge characterized as "opin[ing] convincingly, that [d]efendant is in need of immediate therapy to address these serious personality issues." Judge Walsh observed Dr. Dasher's testimony revealed defendant "completely reject[d]" the suggestion of therapy, and instead, defendant "claims, it is [p]laintiff who needs therapy." As such, he concluded there is "overwhelming" evidence that plaintiff "needs to be named sole legal custodian of these children."

With respect to relocation, Judge Walsh noted, under N.J.S.A. 9:2-2, a parent who seeks relocation must demonstrate "cause" for the removal, which, as explained by our Supreme Court in Bisbing v. Bisbing, 230 N.J. 309, 312-13 (2017), is "determined by [the] best interests analysis" set forth in N.J.S.A. 9:2-4(c). Judge Walsh also acknowledged that in Bisbing, the Court departed from the two-part removal test in Baures v. Lewis, 167 N.J. 91, 118-20 (2001), when it established the new cause standard.

With these principles in mind and after considering the proofs at the plenary hearing, Judge Walsh granted plaintiff's request to relocate to Florida and incorporated his custody findings into his relocation analysis. The judge explained he reached the decision to permit plaintiff and the children to relocate

14

to Florida to "provide the children with more support and allow them to avoid the constant emotional trauma of shuttling back and forth between parents . . . [and] more hostile interactions." The judge also found both parties had "little backup" to help with the children in New Jersey, whereas plaintiff demonstrated she has family and friends on whom she can rely in Florida. He concluded the current situation in New Jersey is akin to "living on an island, an island of terror." He also held Florida has affordable and safe communities with strong schools, which will also be in the children's best interests.

II.

Before us, defendant argues that Judge Walsh failed to apply the proper standard for removal, based on his statement "[t]he instant situation is not a Bisbing case in the extent that, unlike Bisbing, there is no shared custody agreement previously in existence." Defendant argues this comment by the judge "created not just two classes of parents, but two classes of children; those whose welfare is governed by their best interests and those who[] [are] not." Defendant further maintains Judge Walsh did not apply the proper "best interest analysis" as evidenced by his statement that "Bisbing only referenced 'shared legal custody.'" Although defendant acknowledges Judge Walsh conducted a best interests analysis under N.J.S.A. 9:2-4 with respect to the custody issue, he

15

maintains the judge failed to perform a separate, qualitative analysis "as it pertained to . . . plaintiff's request to relocate" as <u>Bisbing</u> requires.

Defendant argues, for example, that the first factor with respect to a parent's ability to communicate "could . . . be a factor in denying the parent of primary residence the right to relocate," and contends by "simply referring to the analysis performed in establishing custody," the judge's analysis was wholly insufficient. On this point, he points out Dr. Dasher testified the children did not have "any fear or danger" during the parental exchanges, and asserts Judge Walsh's conclusions prioritize plaintiff's needs over what is best for the children because he described defendant as "being 'in the way'" of plaintiff's ability to parent.

Second, defendant contends the judge's decision to award sole legal custody was "in large measure inconsistent with the facts on record." Defendant contends the judge solely relied on past interactions between the parents and "provided scant reference . . . that the parties' ability to cooperate and agree is (or will continue to be) 'completely nonexistent.'" He stated the judge gave "short shift" to more relevant factors because "there was never an allegation . . . that . . . defendant ever committed any act of abuse against his children."

16

Defendant also criticized Judge Walsh's reliance on Dr. Dasher's testing because of defendant's perceived inconsistencies in Dr. Dasher's reports. He contends Dr. Dasher observed defendant was an "excellent" parent yet nevertheless recommended sole legal custody and relocation. He contends the evidence at trial, including Dr. Dasher's testimony, "suggested more than a close bonded relationship" between defendant and his children and does not support Dr. Dasher nor the judge's decision to cut the amount of time defendant spends with the children.

Further, defendant maintains Judge Walsh's factual finding that defendant has an "absolute" inability to modify his behavior is contrary to the record, in light of the improved relationship between the parties since the FRO. Defendant contends the FRO has ceased all "hostile and threatening communications," reflecting defendant's improved behavior and conduct.

III.

A.

"Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Because a trial court 'hears the case, sees and observes the

witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Cesare, 154 N.J. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). As such, "an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "[W]e owe no deference to the judge's decision on an issue of law or the legal consequences that flow from established facts." Dever v. Howell, 456 N.J. Super. 300, 309 (App. Div. 2018) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

B.

In pertinent part, N.J.S.A. 9:2-2 prohibits the removal of a child "without the consent of both parents, unless the court, upon cause shown, shall otherwise order." Our Supreme Court has interpreted "cause" under N.J.S.A. 9:2-2 as requiring the petitioning parent to satisfy the "the best interests analysis . . . set forth in N.J.S.A. 9:2-4(c), supplemented by other factors as appropriate." Bisbing, 230 N.J. at 338 (citing N.J.S.A. 9:2-4(c)). Thus, where the parties dispute a removal, the court determines whether cause has been shown by

applying the best interests factors in N.J.S.A. 9:2-4(c). Ibid. In adopting the best interests standard, the Bisbing Court specifically overruled the two-part removal test Baures v. Lewis, 167 N.J. 91 (2001). 230 N.J. at 312-23.

Thus, N.J.S.A. 9:2-4(c) details the following statutory factors for consideration by trial courts in making custody arrangements and relocation applications:

> [T]he parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

The parent seeking the removal bears the burden of proof to show cause.

Bisbing, 230 N.J. at 323.

Beyond the statutory factors, a court's evaluation of a child's best interests requires it "to consider any and all material evidence." Kinsella v. Kinsella, 150 N.J. 276, 317 (1997) (citing In Re Baby M, 109 N.J. 396, 456 (1988)). This allows each allegation and fact to be heard in context, enabling the judge to gain insight that would not otherwise be possible. The failure to conduct an appropriate best interests analysis constitutes a misapplication of law and is reversible error. A.J. v. R.J., 461 N.J. Super. 173, 182-83 (App. Div. 2019).

"[I]n promoting the child's welfare, the court should strain every effort to attain for the child the affection of both parents rather than one." Beck v. Beck, 86 N.J. 480, 485 (1981) (quoting Turney v. Nooney, 5 N.J. Super. 392, 397 (App. Div. 1949)). A custody and relocation decision "must foster, not hamper," a "healthy parent-child relationship" with both parents. Nufrio v. Nufrio, 341 N.J. Super. 548, 550 (App. Div. 2001).

Applying our deferential standard of review to Judge Walsh's factual findings, and after conducting our de novo review of his applied legal conclusions, we affirm the judge's order establishing sole legal custody and permitting plaintiff to relocate to Florida with the children. We conclude the judge thoroughly considered all the statutory factors and explained the factual findings, which were supported by "adequate, substantial and credible evidence"

20

in the record. <u>Rova Farms</u>, 65 N.J. at 484. Specifically, the judge conducted an extensive evaluation of the applicable factors set forth in N.J.S.A. 9:2-4, recognizing the extensive and relentless abuse from defendant substantiated by the testimony and concluding that it was in the children's best interests for plaintiff to have sole legal custody. We discern no bases to disturb the judge's findings.

We disagree with defendant's contention that Judge Walsh improperly balanced the factors set forth in N.J.S.A. 9:2-4. We are satisfied Judge Walsh properly considered and prioritized the best interests of the children and based his decision on the record. As plaintiff testified and the judge considered, the record reflects a situation where it was "impossible to communicate, let alone reason and try to make any decision" regarding the children, based, in part, on defendant's refusal to acknowledge his need for change or therapy. As Judge Walsh explained, the children were exposed to regular and normalized strife and discord that is particularly acute when the parties were making even simple decisions. We are satisfied that the "overwhelming" record supports Judge Walsh's decision to award plaintiff sole legal custody as it is in the children's best interests and will allow plaintiff to make appropriate decisions regarding their educational, medical and related needs.

We further disagree with defendant's assertion that Judge Walsh improperly considered the effects of the FRO, which, as defendant contends, resolved all issues. His argument is unsupported by the record, including the Our Family Wizard chats, which all took place after February 22, 2023, the date when the FRO was entered. As the record reflects, in response to plaintiff's professional and direct messages, defendant continued to question plaintiff's ability to parent including whether she prioritized her children's safety and insisted plaintiff was controlled by her parents, by way of example. We find the documentary record reveals defendant's recalcitrance and inability to compromise persisted after entry of the FRO.

Further, we disagree with defendant's contention that the judge's factual finding regarding his ability or desire to change are unsupported by the record. As Judge Walsh found and the record supports, defendant regularly refused to accept any responsibility for his actions and testified he was "not looking for problems," insisting instead that the "difficulty is from the other side." Further, both of Dr. Dasher's reports "strongly recommend[ed]" therapy and stressed that "without assistance, defendant's potential for parenting will be undermined." Defendant's testimony, however, suggested a strong aversion to any form of therapy. Indeed, defendant explicitly questioned the effectiveness of a

22

therapeutic approach and testified "[h]ow is therapy going to help me?" Defendant also suggested, with seemingly no basis, that Dr. Dasher's conclusions on his need for therapy are merely the result of plaintiff's counsel being "unhappy with his [first] report."

We also are satisfied that Judge Walsh's relocation decision was equally supported by the record, including Dr. Dasher's testimony, and in the child's best interests, and we discern no basis to disturb it. As Judge Walsh's cogent and thorough decision explained, relocation will permit plaintiff to receive additional support from family and friends, especially as she reenters the workforce. Plaintiff testified she grew up in Florida and maintains lifelong friends and a social and family network who reside there. And, as Dr. Dasher's second report details, "[l]iving with their mother and near their grandparents in Florida" will present the children the opportunity "to obtain stronger and more effective coping mechanisms that will allow them to minimize the negative impact of their father's anger and poor judgement."

We disagree with defendant's contention that Judge Walsh ignored the parts of Dr. Dasher's reports that emphasized his ability to "be an excellent parent." To the contrary, the record reflects the judge considered all the evidence, including Dr. Dasher's expert opinion that found defendant's ability to

23

parent "is [all] for naught if he continues on the current path of chronic mistrust, scorn, denigration, and combativeness."

Finally, we disagree with defendant's argument that Judge Walsh did not apply N.J.S.A. 9:2-2 and Bisbing, based on the judge's comment that the "instant situation is not a Bisbing case in the extent that, unlike Bisbing, there is no shared custody agreement previously in existence." We are satisfied Judge Walsh discussed Bisbing and its principles properly, addressed each applicable N.J.S.A. 9:2-4(c) factor, incorporated those findings into its relocation analysis under N.J.S.A. 9:2-2, and provided additional insight beyond the statute. We conclude the one sentence in the judge's written decision, to which defendant takes issue, is merely an accurate factual distinction that, unlike the custody determination in Bisbing, this case did not have a previous shared-custody agreement in place. The judge's observation clearly does not undermine the merits of his decision, especially in light of the extensive record in support of his factual findings and applicable legal determinations.

We note nothing in our opinion prevents defendant from seeking in the Family Part to modify the judge's custody order in the future upon a showing of changed circumstances. Todd v. Sheridan, 268 N.J. Super. 387, 398 (App. Div. 1993). It is well-established a party seeking to modify a custody order "must

24                                                                                    A-1671-24

bear the threshold burden of showing changed circumstances which would affect the welfare of the children." Ibid. (citing Sheehan v. Sheehan, 51 N.J. Super. 276, 287 (App. Div. 1958)); see also Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) ("[a] party seeking to modify custody must demonstrate changed circumstances that affect the welfare of the children"); Chen v. Heller, 334 N.J. Super. 361, 380 (App. Div. 2000) (party seeking to modify custody must show substantial change in circumstances from time current custody was established).

To the extent we have not specifically addressed any of the parties' remaining arguments, it is because we have determined they lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1671-24